[Civ. No. 20230. First Dist., Div. One. Feb. 7, 1962.]

FRANK W. BRADY, Petitioner, v. THE SUPERIOR COURT OF SAN MATEO COUNTY et al., Respondents; TOWN OF ATHERTON, Real Party in Interest.

George Olshausen and Frank J. Perry for Petitioner.

No appearance for Respondent.

Winston Churchill Black and Willard S. Johnston for Real Party in Interest.

TOBRINER, J.—We must determine here whether the trial court exceeded its jurisdiction in punishing petitioner for contempt. The court based its order on the ground that the occupancy of petitioner's home by his son and a rent-paying friend destroyed the home's status as a "single family dwelling" under the zoning ordinance of Atherton, California. As we shall point out, we do not believe the bare and undefined reference of the ordinance to such a dwelling sustained the court's elaborate definition of it or the court's conviction of contempt.

We describe the factual background which led to the court's orders. Petitioner and his wife own a certain piece of property in Atherton. The improvements consist of the main two-story house in the center of the lot, a second house nearby, a cabana, a swimming pool, a tennis court, a smaller building with a bedroom in it, a hothouse, and a freezer house. Petitioner and

his wife live in San Francisco, visiting or using the Atherton property only on weekends. When, in May 1959, the petitioner was renting the premises to eight tenants, four in the main dwelling and four in accessory dwellings, none of whom were related to the petitioner, Atherton filed a complaint for an injunction alleging that the premises were being occupied in violation of its ordinance 146, an ordinance commonly known and referred to as "Zoning Regulations."

Atherton claimed that the premises were being used other than as a single family dwelling, the only use permitted under the zoning regulations. The regulations provided as follows: " '3-1. In one family residential districts 'A,' 'B' and 'C' no lot or parcel of land, building, structure, or improvement shall be used, and no building, structure or improvement shall be hereafter erected, constructed, structurally altered or enlarged, except for a single family dwelling and accessory buildings thereto. . . .' " The ordinance defined a one-family dwelling as follows: " '22-5. Dwelling, One-Family: A detached building designed for or occupied exclusively by one family.' "

The court rendered a judgment permanently enjoining the petitioner from using the premises for any use other than as a single family dwelling. The findings of fact state that at the time of the commencement of the action the premises were being occupied by eight tenants: four in the main dwelling and four in the cabin structure, none of whom were related to the petitioner. The court held that such occupancy violated the designation of "single family," which it defined as follows: "That the normal use and construction of the phrase 'single family' as used in the Zoning Ordinances means a unit that has a social status, a head who has a right, at least in a limited way, to direct and control those gathered into the household, a moral or legal obligation of a head to support the other members and a state of at least partial dependence by the other members for this support." Subsequently petitioner appealed from the judgment, but due to his failure to file a timely notice of appeal, the appeal was dismissed.

The order to show cause for contempt which instigates the instant matter resulted from the fact that subsequent to such judgment the main building was occupied by two persons, Frank Brady, Jr., the son of petitioner, and Guillermo E. Quijano, Jr., a friend, both graduate students at Stanford University. The students did their own cooking on the premises. Quijano paid petitioner compensation in the amount of

$20 per month for his occupancy. The son paid nothing. The occupants further paid the costs of the utilities.

The court found petitioner in contempt of court for wilful disobedience of the permanent injunction in permitting two individuals, neither members of the same single family nor related to each other in any way, jointly to use and occupy the premises. Holding the use of the premises to be other than as a single family dwelling, as the court defined the term, the court ordered that petitioner be fined $250. While the court distinguished the use of the lot by Quijano and Brady, Jr., from the original leasing of the premises to eight individual tenants, the court found the occupancy of the premises by the students not that of a single family. The court further held that Brady, Jr., alone or in conjunction with any member of the Brady family could have occupied the premises without violating the ordinance.

Our sole province is to pass upon the validity of the court's ruling that petitioner committed a contempt because he permitted the occupancy of the premises by the two students. We are not required here to review the original judgment holding that the leasing of the premises to the eight individual tenants violated the ordinance.

Our present probe of the court's jurisdiction to punish for contempt must lead inexorably to an examination of the jurisdiction of the court to apply its injunction to the occupancy of the two students. The stream cannot rise above its source; the jurisdiction to hold in contempt cannot be greater than the jurisdiction to command observance of the ordinance because of a violation. As we shall point out, we do not think the ordinance can be stretched to apply to the challenged occupancy. Whatever the meaning of "single family dwelling," it cannot embrace the trial court's requirement that there be a "head" who would "direct and control" the "household," who had a "moral or legal obligation" at least partially to support the other members, so that the failure of the occupants to comply with that definition generated a contempt proceeding.

Petitioner could properly invoke certiorari to test the court's order of contempt if the court exceeded its jurisdiction. Since the order of contempt is not appealable, it may under such circumstances, be reviewed on certiorari. (Code Civ. Proc., § 1222; *Tripp* v. *Tripp* (1922) 190 Cal. 201, 202 [211 P. 225]; *Nutter* v. *Superior Court* (1960) 183 Cal.App.

2d 72, 73 [6 Cal.Rptr. 404]; *Auto Equity Sales, Inc.* v. *Superior Court* *(Cal.) [18 Cal.Rptr. 479, 368 P.2d 97].)[1]

A series of California cases hold that the violation of an order which exceeds the court's jurisdiction cannot produce a judgment of contempt. Mr. Justice Wood in *Oil Workers Intl. Union* v. *Superior Court* (1951) 103 Cal.App.2d 512 [230 P.2d 71] ruled: "If it be determined that in the rendition of said judgment the trial court acted within its jurisdiction, then the inquiry ends, and the only order the reviewing court is authorized to make is one affirming the proceedings of the trial court. On the other hand, should it appear from the record as certified to us that the court either had no jurisdiction to pronounce said judgment, or exceeded its jurisdiction in doing so, then the proceedings should be annulled." (P. 526.) (See also *In re DeSilva* (1948) 33 Cal. 2d 76, 80 [199 P.2d 6]; *Harlan* v. *Superior Court* (1949) 94 Cal.App.2d 902, 905 [211 P.2d 942]; *Silvagni* v. *Superior Court* (1958) 157 Cal.App.2d 287, 291 [321 P.2d 15]; *McLaughlin* v. *Superior Court* (1954) 128 Cal.App.2d 62, 65 [274 P.2d 745].) As Witkin states: the "view, long settled in California, is that a void order is never binding, and that its violation cannot constitute contempt. A party affected by an order may, and usually will, seek some orderly judicial means of setting it aside; but he may also ignore or disobey it at his peril. If he guesses wrong, he may be punished; if he guesses right, the final judicial determination that the order was without or in excess of jurisdiction is necessarily a determination that he committed no punishable wrong in violating it." (1 Witkin, Cal. Procedure, § 155, pp. 421, 422.)

Turning then to the question of jurisdiction, we note that that concept, which originally attached only to the cause and to the parties, has in recent cases been extended. Witkin points out, "It is now recognized that the term 'jurisdiction' does not have a single, fixed meaning, but has different meanings in different situations. The practical approach to the subject, therefore, is by classification rather than definition; i.e., the scope and meaning of the term will best be discovered by an examination of the situations in which problems of

[1]Atherton states that it "agrees . . . that there is no appeal from a judgment of contempt, and that since a jail term was not imposed by the Superior Court, the proper way to test the order is by a Petition for a Writ of Certiorari."

*A rehearing was granted by the Supreme Court on February 14, 1962. The final opinion is reported in 57 Cal.2d 450 [20 Cal.Rptr. 321, 369 P.2d 937].

jurisdiction are involved." (1 Witkin, Cal. Procedure, § 1, p. 273.) ▮▮▮ The Supreme Court in the landmark case of *Abelleira* v. *District Court of Appeal* (1941) 17 Cal.2d 280 [109 P.2d 942, 132 A.L.R. 715] amplifies this approach: "Speaking generally, any acts which exceed the defined power of a court in any instance, whether that power be defined by constitutional provision, express statutory declaration, or rules developed by the courts and followed under the doctrine of *stare decisis*, are in excess of jurisdiction, in so far as that term is used to indicate that those acts may be restrained by prohibition or annulled on *certiorari.*" (P. 291.)

Two cases, *Fortenbury* v. *Superior Court* (1940) 16 Cal.2d 405 [106 P.2d 411], and *Kreling* v. *Superior Court* (1941) 18 Cal.2d 884 [118 P.2d 470], in particular, tell us that we must examine the trial court's jurisdiction to issue the injunction which produced the violation and the consequent contempt proceedings. Thus, in *Fortenbury* petitioner "was held guilty of contempt of court for violating a temporary restraining order prohibiting picketing in connection with a labor dispute." (P. 406.) The Supreme Court posed the problem of whether the trial court had "*jurisdiction*" "to enjoin the petitioner and his associates from picketing." (P. 409, emphasis added.) The court explained: "A court may have jurisdiction of the cause of action and of the parties, but it may lack the authority or power to act in the case except in a particular way. Under such circumstances, it is now generally held that the court had no jurisdiction." (Pp. 407-408.) Holding that "under the modern practice, the writ of *certiorari* may properly be used to question the exercise of unauthorized power in a case where the court had jurisdiction of the parties and the subject matter," (p. 408) the court concluded: "The superior court, therefore, had no jurisdiction to issue the restraining order, which was violated, and should not have adjudged the petitioner guilty of contempt." (P. 410.)

In *Kreling*, the court held that the complaint did not set forth sufficient facts to demonstrate the commission of a public nuisance by petitioners and that therefore they could not be punished in contempt. It stated: "Allegations of fact are required from which it can be determined that the furnishing of such services and supplies is within the statutory definition of 'public nuisance' as activity '. . . which is injurious to health, or is indecent or offensive to the senses, or an obstruction to the free use of property. . . .' (Civil Code, §§ 3479, 3480; *People* v. *Lim, supra* [18 Cal.2d 872 (118 P.2d 472)].)

In the absence of such allegations the court had no adequate basis for the issuance of its restraining order which, in broad terms, enjoined petitioners from printing or distributing racing forms and scratch sheets. . . . It is clear, therefore, that the restraining order granted in the present case exceeded the authority of the trial court and is invalid.'' (Pp. 886-887.)

The principle of these cases has not been disturbed by Atherton's citations, which we now discuss. Thus *Signal Oil etc. Co.* v. *Ashland Oil etc. Co.* (1958) 49 Cal.2d 764 [322 P.2d 1], involved a preliminary injunction against the violation of an agreement which the court eventually found invalid. In that litigation appellants relied upon *Abelleira* v. *District Court of Appeal, supra,* 17 Cal.2d 280 for the contention that the court lacked jurisdiction to give the relief which it had granted .Appellants also cited *Hunter* v. *Superior Court* (1939) 36 Cal.App.2d 100 [97 P.2d 492]. Justice Schauer in *Signal Oil* points out that in *Vasquez* v. *Vasquez* (1952) 109 Cal.App.2d 280, 283-284 [240 P.2d 319], the court cited *Hunter* ''for the proposition that 'A judgment based on an illegal contract because it was in restraint of trade is void where the illegality appeared on the face of the judgment roll,' adding, however, 'If a court grants relief, which under no circumstances it has any authority to grant, its judgment is *to that extent* void.' '' (P. 778.) The Justice proceeds to explain why *Hunter* differs from the case before the court. ''As noted hereinabove, the invalidity of the Agents' Agreement in this case does not appear as a matter of law on the face of the complaint or the restraining order, and the relief granted was not of a character which 'under no circumstances' it had 'any authority to grant.' The *Hunter* case is thus clearly distinguishable.'' (P. 778.) The opinion concludes: ''The legality of a contract presents a question of law, and a temporary restraining order enforcing (prohibiting breach of) such contract is not invalid merely because the court decided that question erroneously in the first instance and it was subsequently determined that the contract was illegal and void.'' (P. 778.)

In the instant case the invalidity of the challenged definition of single-family dwelling does ''appear as a matter of law on the face of the complaint'' and the relief afforded by the court was ''of a character'' which it did not under any circumstances have '' 'authority to grant.' '' (P. 778.) The situation here contrasts with that of *Signal Oil* not only in the' self-apparent unauthorized' extension of the court's pro-

cess but in the nature of the interests invaded. As we have suggested *supra*, these considerations are factors in determining whether the court has exceeded its jurisdiction, a question largely determined by the inherent characteristics of each case. Like the interest involved in *Fortenbury* v. *Superior Court, supra*, 16 Cal.2d 405, the petitioner's interest here is an important one : the use of his own home, a matter that touches more than a technical interpretation of contract. Finally *Signal Oil* did not involve a citation for contempt. Thus, as *Hollywood Circle, Inc.* v. *Department of Alcoholic Beverage Control* (1961) 55 Cal.2d 728 [13 Cal.Rptr. 104, 361 P.2d 712] states, citing *Signal Oil*, the instant judgment granting the injunction might be upheld as res judicata on appeal although in this certiorari upon contempt the court may be found to have exceeded its jurisdiction : "An act that may be in excess of jurisdiction so as to justify review by prerogative writ (*Abelleira* v. *District Court of Appeal, supra*, at 288; *Fortenbury* v. *Superior Court*, 16 Cal.2d 405, 407 [106 P.2d 411]) will nevertheless be res judicata if the court had jurisdiction over the subject and the parties. (*Signal Oil etc. Co.* v. *Ashland Oil etc. Co.*, 49 Cal.2d 764, 776-778 [322 P.2d 1].)" (P. 731.)

Atherton also relies on *Simmons* v. *Superior Court* (1959) 52 Cal.2d 373 [341 P.2d 13], and *Goble* v. *Municipal Court* (1956) 138 Cal.App.2d 725 [292 P.2d 585], but these cases involve attempts to use certiorari to set aside an order and judgment, respectively, as to which the time for appeal had elapsed, rather than contempt proceedings based upon facts which, as in the instant case, had altered since the rendition of the original injunction. Likewise, in *In re Finn* (1957) 155 Cal.App.2d 705, 708 [318 P.2d 816], cited by Atherton, although the matter did involve contempt proceedings, the contempt did not rest upon any facts which changed after the order but upon a judgment which had become final prior to the contempt.

Atherton finally cites 3 Witkin, California Procedure, section 22, page 2492, but this section, in turn, refers to section 115. After describing the general rule in the language of the Supreme Court in *Abelleira*, section 115 refers to *Fortenbury* and finally cautions that "[s]ome old cases and occasional new decisions containing expressions inconsistent with this analysis cannot be relied upon." (1 Witkin, Cal. Procedure, § 115, pp. 378, 379.)

■ Without attempting any general definition of the

elastic words of "jurisdiction" or its counterpart, "excess of jurisdiction," we may at least hypothecate that a court's enforcement by means of contempt of a statute or ordinance in a manner clearly removed from the legislative authorization lies beyond the court's jurisdiction. ▮ No fixed lines define jurisdiction, and any ruling that a court has exceeded it must necessarily be inherently bound to the nature and characteristic of such departure. We think the length of the step beyond the ordinance's authorization, in the nature and characteristic of this case, assumed a jurisdictional aspect.

The trial court's definition and application of single family dwelling proceeded beyond the authorization of the ordinance. We must interpret the words of the ordinance in their strict sense because, although Atherton could have endowed them with restrictive or wide coverage, it did not do so; we can attach to them only their bare meaning. ▮▮ "Single family dwelling" must mean, in our judgment, an individual or a group of persons living on the premises as a single housekeeping unit. We cannot concur with the trial court that the words necessarily require that the unit have a "social status" or "a head who has a right . . . to direct and control those gathered into the household" and who has a moral or legal obligation to support them. Nor does the definition require consanguinity or affinity of the members of the household. On the other hand, it does not, in our opinion, embrace rentals of separate rooms or tenancies of social organizations, such as fraternities or sororities. We shall proceed to set forth in more detail our reasons for these observations.

"Single family dwelling" designates the joint occupancy and use of the dwelling by all of those who live there. The word "single" precludes the segregation of certain portions or rooms for rental. It forecloses *multiple* occupancy of certain portions of the unit for rental as a segregated part, or parts, of the unit. "Dwelling" means the whole of the premises used for living purposes. It must include the use of the common rooms, such as the kitchen, dining room, living room, if any, by all occupants. It refers to, and reinforces, the concept of singular use, as opposed to multiple. The "dwelling" cannot be fragmentized into broken bits of housing for rental return. "Family" signifies living as a family; it inhibits the breaking up of the premises into segregated units. It does not necessarily compel the use of the unit by more than one person. We cannot conceive that Atherton meant to prohibit the occupancy of the unit by a single individual

homeowner. The word must then, instead, refer to the *use* of the premises as a family, or in the manner of a family. Such family use, again, would, and must be, a single and common use of the premises.

"Family" does not, however, necessarily include the requirement that there be a "head" of a number of persons living as a family. For one thing, as we have said, a single person may make use of the premises in the manner of a family. For another, two persons of equal status might occupy the premises, such as siblings, relatives or friends, who would acknowledge no "head." On the other hand, if more than one person does occupy the premises, the parties must live together in the same relationship or manner of a family. Thus the relationship cannot be an organizational one, such as that of a social club or fraternity, which rests upon a social bond rather than a family status.

We shall test these observations against the cases. Preliminarily we must note that the decisions are somewhat disappointing because each turns upon a definition that is far more complete than Atherton's. Thus *Missionaries etc. of La Salette* v. *Village of Whitefish Bay* (1954) 267 Wis. 609 [66 N.W.2d 627], upholds a definition of an ordinance to the effect that a family may consist of "one or more individuals living, sleeping, cooking or eating on premises as a single housekeeping unit." (P. 630 [66 N.W.2d].) *Harmon* v. *City of Peoria* (1940) 373 Ill. 594, 597 [27 N.E.2d 525, 527], sustains a similar definition.[2]

The cases uphold our position that the definition does not compel consanguinity and affinity of the members of the household. In passing upon whether or not the occupancy "by five priests and their two servants" "solely for private residence purposes" (p. 847 [10 N.W.2d]) violated a residential building restriction that the premises not be used or occupied " 'except for a single dwelling house and dwelling house purposes only' " the Supreme Court of Michigan held that there was no violation of the restriction. (P. 848 [10 N.W.2d].) (*Boston-Edison Protective Assn.* v. *Paulist Fathers, Inc.* (1943) 306 Mich. 253 [10 N.W.2d 847].) It poses the objection to the usage in the following language: "[P]laintiffs' claim

---

[2]The original meaning of the word family in the Latin context denoted the household rather than the occupants. Thus Century Dictionary and Cyclopedia states: "L. *familia*, the servants in the household, a household establishment, the domestics collectively; hence the household, the estate, property, rarely in the later and mod. sense of family (parents and children) for which L. *domus* was used."

seems to be that this restriction as to use limits the occupancy of the residence to persons of one (and the same) family, i.e., persons related to each other by blood or marriage." (P. 848 [10 N.W.2d].) The court states: "In the recent years, many 'families' have taken into the home a refugee from foreign lands, which could not be done, under a literal construction of plaintiffs' claim, if the humanitarian family happened to occupy a residence in a district restricted to 'one-family' dwellings. . . . [T]he restriction must be given a construction within reason. . . . [I]t would not be reasonable to declare the rule to be that a restriction limiting the use of premises to a one-family dwelling means that the dwelling may be used only by those who are members of a single family related within the degrees of consanguinity or affinity." (P. 848 [10 N.W.2d].)

That the taking in of boarders does not necessarily destroy the characteristic of the premises as a family dwelling becomes clear from the ruling in *Gallon* v. *Hussar* (1916) 172 App. Div. 393 [158 N.Y.S. 895] in which case the restrictions provided "that no dwelling shall be occupied by more than two families. . . ." (P. 897 [158 N.Y.S.].) The objection that some of the defendants had taken boarders into the dwelling house was met by the following observation of the court: "Upon what theory the taking of boarders in and by a private family, in their dwelling house, can be deemed to be violation of the restrictions specified, as the trial court evidently has decided, I do not understand. . . . In practically every suburb of New York City, such as Mt. Vernon, New Rochelle, or White Plains, in which nearly all of the newer sections have quite as stringent restrictions as these, the taking of boarders in private houses in such sections has been carried on for years, without any question of its violating such a restriction having been even raised." (P. 898 [158 N.Y.S.].)

At the same time the cases hold that the "single family dwelling" precludes separate tenancies. In interpreting a restriction of the use of premises to a one-family dwelling the New York Court in *Mayer* v. *Livingston* (1958) 11 Misc.2d 287 [172 N.Y.S.2d 45] stated: "In the case at bar, the letting of rooms to outsiders goes beyond a mere incidental maintenance of a one-family residence." (P. 46 [172 N.Y.S.2d].) *Kalb* v. *Mayer* (1914) 164 App.Div. 577 [150 N.Y.S. 94], similarly holds that a fragmentization of the use of the premises by separate entities destroys the one family dwelling. The court says: "I do not mean to suggest that the word

'family' in its broad sense may not include persons boarding or lodging in the house; but I consider that the definition cannot be widened to include several distinct families, combined only for economic purposes.'' (P. 95 [150 N.Y.S.].)

The cases also sustain our belief that the ordinance does not cover the occupancy of the premises by a fraternity or sorority. Holding that it is ''unrealistic and without merit'' (p. 755 [168 N.Y.S.2d]) to contend that a single family residence embraced the use and occupancy of the premises as a college fraternity, the court in *City of Schenectady* v. *Alumni Assn. of Union Chapter* (1957) 5 App.Div.2d 14 [168 N.Y.S. 2d 754], held that a fraternity with 23 resident members did not constitute a single family.

Just as many of the ordinances discussed *supra* specifically define a single family dwelling, so Atherton has the prerogative of enacting a precise ordinance. It can, indeed, limit by number the persons who may live in such dwelling. Without passing upon the validity of such ordinances, and for the purpose of illustration only, we set forth[3] a number of zoning regulations of California cities and counties which define the word family, in single family residential districts, many of which contain a numerical restriction.

---

[3]*County Ordinances:*

*Contra Costa County*—Ordinance No. 382: ''*Family*—One person or group of persons, whether or not related to each other . . . living together . . . includes servants.'' *Fresno County*—Ordinance No. 322: ''*Family*—An individual, or two (2) or more persons related . . ., or a group of not more than five (5) persons, excluding servants, who are not related . . . living together as a single housekeeping unit.'' *Marin County*—Ordinance No. 264: ''*Family*—One or more persons occupying a premises and living as a single non-profit housekeeping unit. . . .'' *City and County of San Francisco*—Municipal Code, Part II, Chapter II (Ordinance No. 492-58): ''*Family*—One or more persons . . . as a single and separate housekeeping unit.''

*City Ordinances:*

*Davis*—Ordinance No. 146: ''*Family*—One or more persons . . . living as a single housekeeping uuit . . . including necessary servants.'' *Fremont*—Municipal Code, Chapter II, Title VIII: ''*Family*—A person living alone, or two or more persons living together as a single housekeeping unit . . . as distinguished from a group occupying a boarding house, lodging house, motel, or hotel, fraternity, or sorority house.'' *Larkspur*—Ordinance No. 276: ''*Family*—One or more persons occupying a premises and living as a single non-profit housekeeping unit. . . .'' *Los Altos*—Ordinance No. 146: ''*Family*—An individual or two (2) or more persons related by blood or marriage, or a group of not more than five (5) persons, not including servants, who need not be related by blood or marriage, living as a single housekeeping unit.'' *Los Angeles*—Ordinance No. 90,500: ''*Family*—An individual, or two (2) or more persons related . . ., or a group of not more than five (5) persons (excluding servants) who need not be related . . . living together as a single housekeeping unit.'' *Menlo Park*—Ordinance No. 228: ''*Family*—

Finally, the term "single family dwelling" as used in the ordinance modifies both *use* and *erection* of a dwelling; the term must carry the same meaning in both situations. The zoning regulations provide in part: "In one family residential districts . . . no lot or parcel of land, building, structure, or improvement shall be *used,* and no building, structure or improvement shall be hereafter *erected,* . . . except for a *single family dwelling. . . .*" (Emphasis added.) The erection or construction of a "single family dwelling," in itself, would imply that any building so constructed would contain a central kitchen, dining room, living room, bedrooms; that is, constitute a single housekeeping unit. Consequently, to qualify as a "single family dwelling" an erected structure need only be used as a single housekeeping unit.

Finally, we note that the trial court's definition of a single family dwelling derives its remote origin from the homestead laws, which obviously fulfill different functions than zoning laws. Specifically, the Oklahoma case of *Union Trust Co.* v. *Cox* (1916) 55 Okla. 68 [155 P. 206, L.R.A. 1917C 356], incorporates from *Roco* v. *Green* (1878) 50 Tex. 483 (p. 209 [155 P.]) the definition which the trial court used here. Not only does the *Union Trust* case distinguish the California case of *Roth* v. *Insley* (1890) 86 Cal. 134 [24 P. 853], which was based upon a different statute, but also the Oklahoma court explains that a particular purpose of homestead laws is to excuse the payment of debts under certain circumstances and that therefore they are to be strictly construed. Thus, the court states: "We find no adjudicated case holding that the duty to support and maintain a cousin is greater than the duty to pay one's debts, and we believe the better reasoning supports the proposition that a debtor has no moral or legal

---

An individual or two or more persons related . . . or a group of not more than five (5) persons (excluding domestic employees) who need not be related . . . living together as a single non-profit housekeeping unit. . . ." *Mill Valley*—Ordinance No. 457: "*Family*—One or more persons . . . living as a single domestic housekeeping unit. . . ." *Mountain View*—Ordinance No. 175.181: "*Family*—One or more persons . . . living as a single housekeeping unit. . . ." *Oakland*—Ordinance No. 474: "*Family*—An individual or two or more persons related . . . , or a group of not more than five (5) persons (excluding servants) not related . . . living together as a single non-profit housekeeping unit." *Palo Alto*—Ordinance No. 1324: "*Family*—One person . . . or two or more persons related . . . or a group not exceeding four persons . . . as a single housekeeping unit." *San Leandro*—Municipal Code, Chapter 3, Title VII: "*Family*—One or more persons . . . living as a single housekeeping unit." *Santa Clara*—Ordinance No. 918: "*Family*—One or more persons . . . living as a single housekeeping unit."

right to appropriate assets that should be applied to the payment of one's debts and expend the same in providing a home for so distant a relative as a cousin. Thompson on Homestead and Exemptions, § 45.'' (P. 210 [155 P.].)

Atherton's remaining cases, relying upon the definition of homestead and exemption laws, (*Lobban* v. *Vander Vries Realty & Mortgage Co.* (1936) 48 Ariz. 180 [60 P.2d 933]; *Sheeby* v. *Scott* (1905) 128 Iowa 551 [104 N.W. 1139, 4 L.R.A. N.S. 365]; *Owens* v. *Altsheller & Co.* (1936) 263 Ky. 727 [93 S.W.2d 844]; *Wineblood* v. *Payne* (1928) 129 Okla. 103 [263 P. 669]), are therefore distinguishable.

█ The above analysis indicates that the use of the house by the two students as a single housekeeping unit would suffice to fall within the bare definition of single family dwelling. The students used the kitchen and common facilities as a single unit. They did not divide or fractionalize the occupancy into separate segments. Such single use is to be contrasted with the multiple use of the premises which originally precipitated the issuance of the court's injunction. Then eight tenants occupied the premises, four in the main building and four in the cabin structure; the use of the latter was not accessory or incidental to the main building.

█ We must therefore conclude that Atherton's attempted enforcement of its zoning ordinance through the process of this contempt must fail. The court exceeded its jurisdiction in elaborating the bare words of the ordinance into its extensive definition and applying it to the two students. While we recognize the importance of zoned and planned community development in this day of population expansion and ensuing land contraction, Atherton, despite an opportunity for clarity, has enacted an ordinance of ambiguity. It has left to the courts the task of attempting to fill in the content, an undertaking which may be better discharged by the legislative rather than the judicial branch of the government. If Atherton wants more restrictive zoning than its present enactment provides, Atherton has the ready solution of passing a more explicit ordinance.

The judgment of contempt is annulled.

Bray, P. J., and Agee, J.,* concurred.

A petition for a rehearing was denied February 23, 1962, and the petition of the real party in interest for a hearing by the Supreme Court was denied April 3, 1962.

---

*Assigned by Chairman of Judicial Council.