BRUCE S. BERGER AND FREDERICKA NOLDE BERGER, HIS WIFE, ROBERT B. LEWIS AND MARGARET McE. LEWIS, HIS WIFE, JOHN McMULLEN AND JACQUELINE McMULLEN, HIS WIFE, AND FREDERIC GUSMER AND PATRICIA GUSMER, HIS WIFE, PLAINTIFFS-APPELLANTS, v. THE STATE OF NEW JERSEY, MAURICE G. KOTT, ACTING COMMISSIONER OF THE DEPARTMENT OF INSTITUTIONS AND AGENCIES OF THE STATE OF NEW JERSEY, DEFENDANTS-RESPONDENTS, AND WILLIAM GRAESSLE AND FLORENCE A. GRAESSLE, HIS WIFE, AND THE BOROUGH OF MANTOLOKING, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANTS.

Argued January 26, 1976—Decided September 21, 1976.

Mr. *Charles Danzig* argued the cause for appellants Berger, Lewis and McMullen (*Messrs. Riker, Danzig, Scherer and Debevoise,* attorneys; *Mr. Danzig* of counsel; *Mr. George C. Pappas* on the brief).

Mr. *Thomas J. Gunning* argued the cause for appellants Gusmer (*Messrs. Sim, Sinn, Gunning, Serpentelli and Fitzsimmons,* attorneys; *Mr. Gunning* on the brief).

Mr. *Michael S. Bokar,* Deputy Attorney General, argued the cause for respondents (*Mr. William F. Hyland,* Attorney General of New Jersey, attorney; *Mr. Stephen Skillman,* Assistant Attorney General, of counsel; *Mr. Bokar* on the brief).

The opinion of the court was delivered by

MOUNTAIN, J. This case presents the question of whether a group home for multi-handicapped, pre-school children must cease its operation either because of restrictive covenants in deeds of record or because of zoning provisions limiting the area to single family dwellings.

By deed dated July 9, 1973 William and Florence A. Graessle conveyed their premises in the Borough of Man-

toloking as a gift to the New Jersey State Department of Institutions and Agencies. The deed specified that the premises, on which were located a well-maintained, 12 room ocean-front house and three-car garage, were to be known as the Graewill House and were to be devoted exclusively to the care of disadvantaged pre-school children under the age of nine. If the property were not so used, it would revert to the grantors. Moreover, the deed specified that the conveyance was subject to easements, covenants and restrictions of record as well as to the Borough's zoning provisions.

Pursuant to these conditions, the State formulated plans to utilize the property. The State intended that 8 to 12 multi-handicapped, pre-school children, most of whom would be wards of the State, would reside in the home with a married couple having 22 years of experience as foster parents. This arrangement would enable the children, who would otherwise be confined to hospitals, to grow and develop in a family environment. Supportive services would be provided by an educational specialist, two paraprofessionals, a cook-housekeeper and a maintenance man, none of whom would reside on the premises.

The children would neither attend local public schools nor participate in local community programs such as the Little League. Rather, most of their activities including school instruction, as well as play, training and physical therapy sessions, would take place at Graewill House. Their length of stay in the home, to be determined by individual progress, was anticipated to average between 12 and 18 months. Ultimately, it was hoped that the children, having learned adequately to cope with their individual handicaps, would be able either to return to their own homes or be placed in adoptive or foster homes.

In formulating these plans, the State also engaged in negotiations with the Mayor and Borough Attorney of Mantoloking and conducted a public meeting attended by concerned residents of the municipality. Ultimately, in the fall of 1973, the State agreed to execute a binding agreement

with the Borough, which was to provide, among other things, that no more than 12 children and the appropriate staff would reside at Graewill House at any one time, that the State would maintain the structure to conform with the appearance of the neighborhood, and that a community advisory committee would be established to participate in the implementation of the project. This agreement was to be effective for a period of fifteen years. The record is not clear as to whether such an agreement was actually executed and delivered.

Four couples owning property either adjacent or in close proximity to the Graessle premises instituted this action on October 30, 1973 to restrain the use of the facility proposed by the State. Named as defendants were the State of New Jersey, Maurice G. Kott, Acting Commissioner of the Department of Institutions and Agencies, William and Florence A. Graessle, and the Borough of Mantoloking. Plaintiffs predicated their challenge on two bases: first, that the intended use of the Graessle premises would constitute a clear violation of the negative reciprocal covenants contained in deeds of record establishing a neighborhood scheme of single family residences, and second, that the proposed use would contravene Mantoloking's zoning ordinance restricting the area to single family dwellings.

Plaintiffs' application for a preliminary injunction was denied on November 29, 1973. At approximately the same time, the State officially began using Graewill House to care for handicapped children in the manner set forth above, a use which presently continues. Cross motions for summary judgment were made by the parties, culminating in a decision rendered July 26, 1974 denying plaintiffs' motion and granting summary judgment to defendants. The trial court's decision was based upon findings that the restrictive covenants regulated only the type of structure, not the occupancy or use of the premises, and that in any event the house was being used as a dwelling. It was also held that the zoning ordinance was invalid and that the State enjoyed immunity

from its provisions. We certified plaintiffs' appeal prior to argument in the Appellate Division. 68 *N. J.* 175 (1975). For reasons hereinafter set forth we affirm.

Plaintiffs' first contention is that the use of the Graessle premises as a group home violates restrictive covenants in deeds of record establishing a neighborhood scheme of single family residences. Title to the premises of the plaintiffs and the Graessles, as well as title to much other adjoining land, derives from a common grantor, Bayhead-Mantoloking Land Co. (Bayhead). About the year 1925, Bayhead plotted a large tract of land into numerous lots and filed a map of the tract as plotted. In conveying the lots, Bayhead included restrictions in each deed limiting the permissible structures on the premises to dwelling houses with private garages and prohibiting manufacturing or any dangerous, noxious or offensive use.[1] Plaintiffs allege Graewill House fails to conform to these restrictions.

---

[1]More specifically, the deed conveying land now owned by plaintiffs Berger specified:
*FIRST.* That no building of any kind shall be erected or permitted upon the said lot excepting a dwelling house and its appurtenances, including a garage for private use only.
*SECOND.* That only one dwelling house shall be permitted upon such lot.
\*     \*     \*     \*     \*     \*     \*     \*
*SIXTH.* That the said premises shall not be used for manufacturing or for any dangerous, noxious or offensive purposes, or for the erection and maintenance of a public garage or oil station.
The deed conveying adjoining property, which included the land subsequently owned by defendants Graessle contained the following restrictions:
*FIRST.* That only six dwellings (including private garage with each) shall be erected on said tract, said houses to be situated as follows: two between Ocean Avenue and the Ocean, two on the west side of Ocean Avenue, and two facing Barnegat Bay.
*SECOND.* That no other building of any kind is to be erected on said tract.
\*     \*     \*     \*     \*     \*     \*     \*
*SIXTH.* That the said premises shall not be used for manufacturing or for any dangerous, noxious or offensive purposes, or for the erection and maintenance of a public garage or oil station.

■ Analytically, these covenants impose three types of restriction. First, they prohibit the use of the property for certain non-residential purposes. Secondly, except for a private garage, no building may be erected that is not a dwelling house. Finally, the number of buildings (dwelling houses) that may be built on each lot is limited — apparently to a single such structure, with or without private garage. It will be noted that the covenants do not restrict the usage of the buildings to *one-family* residences. This being so, our decisional law holds that multi-family occupancy will not violate the covenant.

*Bruno v. Hanna,* 63 *N. J. Super.* 282 (App. Div. 1960) is in point. There the covenants read as follows:

> That no more than one residence or dwelling house shall be erected on any lot hereby conveyed. . . .
> That the premises hereby conveyed shall be used for dwelling purposes only. . .
>
> [63 *N. J. Super.* at 284]

These are essentially the same covenants we consider here. In *Bruno,* plaintiffs proposed to construct duplex dwellings for two or more families. In finding that such use would not violate the covenants, Judge (now Justice) Sullivan pointed out that

> The covenants under consideration, insofar as use is concerned, provide nothing more than that the premises 'shall be used for dwelling purposes only.' There is no attempt to restrict the use to single family occupancy. The other covenant specifies 'That no more than one residence or dwelling house shall be erected on any lot.' The word 'one' obviously refers to the number of buildings, and the words 'residence or dwelling house' indicate the permissible type of structure.
>
> [63 *N. J. Super.* at 285]

It will be observed that the court looked to the literal language of the covenants and refused to indulge in specula-

---

The deeds conveying all of the 254 contiguous lots delineated on the Map contained restrictions similar or identical to those set forth above.

tion as to whether there might not be perceived an unexpressed but fairly deducible conclusion that *single family* residential use had been intended. In so doing the court adhered to the well established rule applicable to the interpretation of all such provisions, which it expressed in these words:

Restrictions on the use to which land may be put are not favored in law because they impair alienability. They are always to be strictly construed, and courts will not aid one person to restrict another in the use of his land unless the right to restrict is made manifest and clear in the restrictive covenant. [*Id.*]

■ While in some instances the protections such covenants afford probably increase the value of property and may enhance marketability, they do nonetheless raise title problems and impair alienability. We adhere to the view that they must be strictly construed. Such covenants have, or may have, a very important effect upon land use. The limitations and prohibitions they impose may be felt over a very long period of time. It is not too much to insist that they be carefully drafted to state exactly what is intended — no more and no less.

The authorities in this State supporting the holding in *Bruno v. Hanna, supra,* include *Fortesque v. Carroll,* 76 *N. J. Eq.* 583 (E. & A. 1910) ; *Underwood v. Herman & Co.,* 82 *N. J. Eq.* 353 (E. & A. 1913) ; *Crane v. Hathaway,* 4 *N J. Misc.* 293 (Ch. 1926). The rule is sustained by the clear weight of authority elsewhere. Annotation, "Multiple Residence as Violation of Restrictive Covenant," 14 *A. L. R.* 2d 1376, 1382 (1950).

■ It is also urged that the language utilized in the restrictive covenants here in issue manifests an intent to limit permissible structures to those used for *private residential living.* Accepting this contention *arguendo,* we do not agree that the present use of Graewill House violates the covenants. On the contrary, we look upon the present use as being that of a private residence for a limited number

of children and their foster parents. We are unpersuaded by plaintiffs' argument that Graewill House is, in essence, a state institutional establishment in a residential area and thus antithetical to the neighborhood scheme of private residences, which for purposes of this argument we assume was intended. Neither the fact that the children's placement in the home is of qualified duration, nor the fact that some of their needs are met by various non-residents, strips Graewill of its predominantly residential character. A building intended to house a small number of children, together with their temporary foster parents, in an environment that approximates that of a more conventional family does not lose that characteristic and quality merely because the children require and receive specialized training and treatment.

Plaintiffs further assert that the covenants in question require not only residential living but also occupancy by a single family. As we have seen above, there is nothing in the express language of the covenants to support this contention. In furtherance of this proposition, however, they rely on statements of Mr. Otis C. Strickland, the Secretary Treasurer of the common grantor, Bayhead-Mantoloking Land Co., who prepared most of the deeds from Bayhead during 1925 and 1926. According to Mr. Strickland, the purpose of the covenants was "to create and impose a neighborhood scheme of single family residential living" in order "to preserve the family residential nature of the area." Moreover, he stated that the term dwelling house "was intended to establish the private residential scheme in accordance with the meaning and use of said term in 1925" and that "places of accommodation, such as boarding houses" were intended to be excluded.

Again conceding, for the sake of argument only, that single families may have been envisioned by the common grantor, we are unable to perceive in the avowed intent of Bayhead any design to restrict the use of the affected premises to single families comprised exclusively of related members. There is simply nothing to suggest that the relation-

ship of the persons within a dwelling was of any concern to the common grantor. Rather, it is reasonable to conclude that its predominant interest was to preserve a family style of living, that is, a style characterized by fairly stable, rather than transient relationships, a single household headed by adults who both control and guide such children as may reside with them. It is clear that this style of living prevails at Graewill. The children reside with and are dependent upon a unique set of parents, parents who have assumed the responsibility of providing a family environment for them. That these children are unrelated in a biological way to each other and to these parents does not negate the fact that they live and function as a family entity. Thus, we are unable to conclude that the concept of family residential living, even were it shown to have been envisioned by Bayhead, is so narrow as to exclude from its ambit the "family" presently occupying Graewill House.

In light of the above, we find that the use of the Graessle premises as Graewill House does not violate the restrictive covenants of record nor does it contravene the neighborhood scheme. To the contrary, the use of the premises as a group home for handicapped children is clearly within the use contemplated by the term "dwelling house" and in conformity with, rather than in derogation of, the purported neighborhood scheme of residential living.

The other basis for plaintiffs' attack is that the use of the Graessle premises as a group-care home violates the zoning ordinance of the Borough of Mantoloking, which provides for only two zones within the municipality, a business zone and a residential zone. The latter zone, which encompasses 95% of the land of the Borough and includes the Graessle tract, is restricted to "single family dwellings," defined as "detached building[s] designed for, or occupied exclusively by, one family in one dwelling unit." "Family" is defined as

one person living alone or two or more persons related by blood, marriage or adoption and living together as a single unit in one house

or within one curtilage and under one head (pater or mater familias) ; domestic servants, one companion, one housekeeper and occasional non-paying guests may be included but no other person.

It is readily apparent that the residents of Graewill House do not constitute a family as defined by the above quoted section of the ordinance. We are, however, for reasons discussed below, unable to accept plaintiffs' argument that the operation of Graewill House should therefore be enjoined.

Initially, it should be noted that state agencies are generally immune from the zoning ordinance provisions of a municipality. *Rutgers v. Piluso,* 60 *N. J.* 142, 153 (1972). *See generally* 2 Anderson, *American Law of Zoning* § 9.06 (1968); *Note, Governmental Immunity from Local Zoning Ordinances,* 84 *Harv. L. Rev.* 869 (1971). While there are no precise criteria by which to determine the existence or scope of such immunity, we have recognized that the test is basically one of legislative intent — i. e., whether the Legislature intended the particular governmental unit to be immune with respect to the particular enterprise. As we indicated in *Rutgers v. Piluso, supra,* legislative intent is to be gleaned from a number of factors, including "the nature and scope of the instrumentality seeking immunity, the kind of function or land use involved, the extent of the public interest to be served thereby, the effect local land use regulation would have upon the enterprise concerned and the impact upon legitimate local interests." 60 *N. J.* at 153. Consideration of these factors in the instant case compels the conclusion that the State is immune from the Mantoloking zoning ordinance.

The Department of Institutions and Agencies, a principal department in the executive branch of the State government, is entrusted with the responsibility of providing care for children whose needs cannot be adequately met in their own homes. See *N. J. S. A.* 30:4C–1 *et seq.* To advance the public policy of providing adequate care and supervi-

sion for dependent children, the Legislature has proscribed discrimination in zoning regulations as between children in a conventional family setting and children in a group home — defined as any single family dwelling used in the placement of 12 or fewer children and recognized as such by the Department of Institutions and Agencies. *N. J. S. A.* 30:4C–2(m); 30:4C–26; 40:55–33.2. From these enactments, it is clear that the Legislature intended to immunize the Department of Institutions and Agencies from the operation of local zoning provisions which prohibit the establishment of a group home.

Additional considerations buttress our conclusion that the State is immune in the instant case. The use of the Graessle premises as a residence for a group functioning as a family entity substantially effectuates the purposes of the zoning provision sought to be enforced. Moreover, it furthers the public interest of providing quality care for handicapped children. Finally, the impact of Graewill House on legitimate local interests is slight when compared with the beneficial goals sought to be accomplished. Indeed, it is consonant with, not destructive of, the residential nature of the community. All of these factors unite to convince us that the Mantoloking zoning provisions cannot frustrate the State's operation of Graewill.

It is fundamental, however, that any assertion of immunity must be reasonable so as not "to arbitrarily override all important legitimate local interests." *Rutgers v. Piluso, supra,* 60 *N. J.* at 153; *Township of Washington v. Village of Ridgewood,* 26 *N. J.* 578, 584–86 (1958). Plaintiffs assert that the failure of the State to consider the objections of the community prior to establishing Graewill illustrates its unreasonableness. To support their position they rely on *Long Branch Division of United Civic & Taxpayers Org. v. Cowan,* 119 *N. J. Super.* 306 (App. Div.), certif. den. 62 *N. J.* 86 (1972), wherein the Appellate Division held that the State Department of Health was immune from local zoning provisions thus permitting the es-

tablishment of a residential narcotic rehabilitation and treatment center in a residential zone of Long Branch. Nevertheless, the court took cognizance of the widespread opposition registered by the community with respect to the site selection and remanded the matter for a hearing on the issue of whether the Department had acted unreasonably or arbitrarily in selecting the location of the center.

We are not persuaded that the instant case merits the same disposition. We see nothing to suggest that the State acted arbitrarily in deciding to utilize the Graessle premises as a residential home for handicapped children, a use which is markedly different from a drug treatment center. The State negotiated with officials of Mantoloking to assure that Graewill House would continue to be compatible in appearance with the neighborhood and met with concerned residents of the town. The fact that many of the residents voiced opposition to Graewill House does not, in and of itself, mean that the State acted unreasonably in proceeding with its plans. Rather, the reasonableness of its action must be evaluated in terms of the effect Graewill has on the surrounding area. We find nothing to convince us that Graewill has such a detrimental effect as to warrant judicial interference, and have no difficulty in concluding that the State, acting reasonably, is immune from the Mantoloking zoning provisions restricting single family dwellings to persons related by blood, marriage or adoption.

That Graewill has been established as a group home gives rise to an equally compelling reason for our finding the zoning restriction to be without effect. Municipalities must look to legislation to determine the scope of their zoning powers. These are as comprehensive or as restrictive as the relevant statutes determine. The New Jersey Legislature has expressly prohibited municipalities from discriminating in their zoning ordinances governing single family dwellings between children residing therein by virtue of their relationship by blood, marriage or adop-

tion and children residing therein by virtue of their placement in a group home. *N. J. S. A.* 30:4C–26; 40:55–33.2.[2] *See also Y. W. C. A. v Board of Adjustment of City of Summit,* 134 *N. J. Super.* 384, 389–90 (Law Div. 1975), aff'd, 141 *N. J. Super.* 315 (App. Div. 1976). These two statutes were each amended[3] to confirm and clarify the status

---

[2]The recently enacted Municipal Land Use Law, *N. J. S. A.* 40:55D–1 *et seq., L.* 1975, *c.* 291, § 53(c) continues to prohibit zoning discrimination against children placed in group homes. This section provides as follows:

No zoning ordinance shall, by any of its provisions or by any regulation adopted in accordance therewith, discriminate between children who are members of families by reason of their relationship by blood, marriage or adoption, and foster children placed with such families in a dwelling by the Division of Youth and Family Services in the Department of Institutions and Agencies or a duly incorporated child care agency and children placed pursuant to law in single family dwellings known as group homes. As used in this section, the term "group home" means and includes any single family dwelling used in the placement of children pursuant to law recognized as a group home by the Department of Institutions and Agencies in accordance with rules and regulations adopted by the Commissioner of Institutions and Agencies provided, however, that no group home shall contain more than 12 children.

[3]The two enactments were amended to include group homes by *L.* 1974, *c.* 178, which became effective December 10, 1974. Substantially identical definitions of the words, "group home" appear in each amendment. That in the amendment to Title 30 reads as follows:

The term 'group home' means and includes any single family dwelling used in the placement of 12 children or less pursuant to law recognized as a group home by the Department of Institutions and Agencies in accordance with rules and regulations adopted by the Commissioner of Institutions and Agencies; provided, however, that no group home shall contain more than 12 children.
It goes on to provide,

No municipality shall enact a planning or zoning ordinance governing the use of land by, or for, single family dwellings which shall, by any of its terms or provisions or by any rule or regulation adopted in accordance therewith, discriminate between children who are members of such single families by reason of their relationship by blood, marriage or adoption, foster children placed with such families in such dwellings by the Division of Youth and

of group homes for children as being single family units. This clearly evidences the Legislature's desire to accord the same protections to children placed in group homes as had been previously extended to foster children. Moreover, it may be interpreted as indicative of the Legislature's position that the zoning enabling act was not designed to empower municipalities to restrict a family to those biologically or legally related. *Kirsch Holding Co. v. Borough of Manasquan*, 59 *N. J.* 241, 251 (1971). In summary, the Legislature has defined "group home" to include the kind of dwelling arrangement we are considering here, and has further declared that any municipal effort to treat such an arrangement as in any way different than a biological family unit will result in a declaration of invalidity.

Plaintiffs also contend that neither *N. J. S. A.* 30:4C-26 nor 40:55-33.2 validates the use of the Graessle premises as Graewill House because it is not being used as either a foster or group home. Plaintiffs seem to perceive Graewill as a non-residential facility in a single family residential area. While it may differ from the conventional foster or group home in that the children do not become active participants in the community and do require educational and medical services within the home, this is hardly sufficient to justify plaintiffs' characterization of Graewill. It is, both in essence and in operation, a family home and fully within the meaning of group homes as defined in the applicable legislation. As such, it is clear that *N. J. S. A.* 30:4C-26 and 40:55-33.2 invalidates so much of Mantoloking's zoning ordinance as restricts single family dwellings exclusively to persons related by blood, marriage or adoption.

The above statutory ground demonstrably disposes of plaintiffs zoning argument. However, because the matrix of

---

Family Services, and children placed pursuant to law with families in single family dwellings known as group homes.

Any planning or zoning ordinance, heretofore or hereafter enacted by a municipality, which violates the provisions of this section, shall be invalid and inoperative.

this case is the extent to which the residential character of a neighborhood may be preserved by covenant and ordinance, we deem it advisable to speak further on the right of a municipality to zone to achieve that objective.

█ There is no doubt that it is within the competency of a municipality to use its zoning power in order to establish residential areas. *See Collins v. Board of Adjustment of Margate City,* 3 *N. J.* 200, 208 (1949), wherein zoning for single family dwellings was upheld as a valid exercise of police power. The United States Supreme Court recently recognized in *Village of Belle Terre v. Boraas,* 416 *U. S.* 1, 94 *S. Ct.* 1536, 1540, 9 *L. Ed.* 2d 797 (1974) the legitimacy of zoning to preserve a family style of living:

A quiet place where yards are wide, people few, and motor vehicles restricted are legitimate guidelines in a land-use project addressed to family needs. This goal is a permissible one . . . . The police power is not confined to elimination of filth, stench, and unhealthy places. It is ample to lay out zones where family values, youth values, and the blessings of quiet seclusion and clean air make the area a sanctuary for people.

We are in total and complete accord with this reasoning that supports the right of a municipal governing body to endeavor in every legitimate way to secure and maintain "the blessings of quiet seclusion" and to make available to its inhabitants the refreshment of repose and the tranquillity of solitude.

█ Nevertheless, while municipalities are free to zone in such a way as will best attain these values, and to prohibit from such areas any use which threatens to erode such values or destroy the residential character of the area, all restrictions must, at the same time, satisfy the demands of due process. Substantive due process requires that zoning regulations be reasonably exercised; they may be neither unreasonable, arbitrary nor capricious. The means chosen must have a real and substantial relation to the end sought to be achieved. Moreover, the regulation must be reasonably

designed to resolve the problem without imposing unnecessary and excessive restrictions on the use of private property. *Kirsch Holding Co. v. Borough of Manasquan, supra,* 59 *N. J.* at 251; *J. D. Construction Corp. v. Board of Adjustment of Township of Freehold,* 119 *N. J. Super.* 140, 145 (Law Div. 1972).

When the Mantoloking ordinance defining "family" as those persons related by blood, marriage or adoption is measured against the demands of due process, it is clear that the regulation must fall. It so narrowly delimits the persons who may occupy a single family dwelling · as to prohibit numerous potential occupants who pose no threat to the style of family living sought to be preserved. As such, we cannot conclude that the definition of "family" is reasonable.

New Jersey courts have consistently invalidated zoning ordinances that were unreasonably restrictive in delineating permissible occupants. For example, in *Kirsch Holding Co. v. Borough of Manasquan, supra,* we struck down regulations which restrictively defined "family" and prohibited group rentals in two seashore communities. Finding that the ordinances precluded many harmless uses in the attempt to avoid rentals to unruly unrelated groups, we concluded, in reasoning that we reaffirm today, that they were sweepingly excessive and thus legally unreasonable.

Similarly, in *Gabe Collins Realty, Inc. v. City of Margate City,* 112 *N. J. Super.* 341 (App. Div. 1970) the court invalidated an ordinance defining family as one or more persons related by blood, marriage or adoption or not more than two unrelated persons. Like the ordinances in *Kirsch,* the municipal enactment was designed to eliminate undesirable group rentals. Judge Conford, writing for the Appellate Division, noted the legitimate municipal desire to control the problems generated by some unrelated groups, but concluded that a municipality may not validly resort to sweepingly excessive restrictions on property rights to eradicate the source of the problem. Such zoning deprives

owners of their property without due process and is thus impermissible.

While we have not hesitated to strike down zoning ordinances that fail to satisfy the demands of substantive due process, we are not unmindful of the problem confronting many municipalities which desire to maintain a prevailing family environment. Their need is to enact ordinances that will both withstand judicial scrutiny, and at the same time exclude uses that may impair the environment. We believe a satisfactory resolution of this problem would result, were local governments to restrict single family dwellings to a reasonable number of persons who constitute a *bona fide* single housekeeping unit. If such a requirement were incorporated into zoning ordinances, it would not only perpetuate the stability, permanence and other beneficial attributes long associated with single family occupancy but also preclude uses closely approximating boarding houses, dormitory and institutional living. Such an enactment — if carefully drawn — would be both reasonably related to the end of maintaining a peaceful family residential style of living — an end we uphold as a legitimate goal of zoning — and yet be neither excessive nor overreaching in its sweep.

The concept of zoning for a single housekeeping unit is not novel.[4] Many zoning ordinances have already gone beyond the notion of restricting single family dwellings to a conventional family unit and have permitted occupancy by a limited number of unrelated persons living together as a single housekeeping unit. *See, e. g.,* ordinances construed in *Palo Alto Tenants' Union v. Morgan,* 487 *F.* 2d 883 (9th Cir. 1973), *cert. denied,* 417 *U. S.* 910, 94 *S. Ct.* 2608, 41 *L. Ed.* 2d 241 (1974) (ordinance defining "family" to

---

[4]In *Gabe Collins Realty, Inc. v. City of Margate City, supra,* 112 *N. J. Super.* at 350, Judge Conford suggested this device as a reasonable solution to the problem of zoning for areas of one and two family occupancy. *See also Marino v. Mayor & Council of Borough of Norwood,* 77 *N. J. Super.* 587, 594 (Law Div. 1963).

include unrelated group of 4 persons living as a single house-keeping unit held valid) ; *Oliver v. Zoning Comm'n of Town of Chester,* 31 *Conn. Super.* 197, 326 *A.* 2d 841, 845 (C. P. Middlesex County, 1974) (community residence for employable retarded adults in which married couple was to serve as houseparents found to be lawful single family use where family was defined as "One or more persons occupying the premises as a single housekeeping unit, as distinguished from a group occupying a boarding house, lodging house, club, fraternity or hotel") ; *Carroll v. City of Miami Beach,* 198 *So.* 2d 643 (Fla. Ct. App. 1967) (novitiate held to be in compliance with ordinance defining family as any number of persons living as a single housekeeping unit). See also 1 *Anderson, American Law of Zoning* § 8.27, at 636 (1968).

Courts have similarly broadened the definition of family by focusing on whether a single housekeeping unit is involved. *See, e. g., Brady v. Superior Court,* 200 *Cal. App.* 2d 69, 19 *Cal. Rptr.* 242, 247–50 (1962) ; 2 *Williams, American Planning Law* § 52.01, at 350 (1974). Illustrative of this approach is *City of White Plains v. Ferraioli,* 34 *N. Y.* 2d 300, 357 *N. Y. S.* 2d 449, 313 *N. E.* 2d 756 (1974), where the court determined that a group home consisting of a married couple, their two children and 10 foster children constituted a single family within the meaning of the ordinance. The zoning ordinance defined family in these terms: "A 'family' is one or more persons limited to the spouse, parents, grandparents, grandchildren, sons, daughters, brothers or sisters of the owner or the tenant or of the owner's spouse or tenant's spouse living together as a single housekeeping unit with kitchen facilities." 357 *N. Y. S.* 2d at 451, 313 *N. E.* 2d at 738. The court emphasized the significance of the fact that the home functioned as a single housekeeping unit and in every outward respect, was a "relatively normal, stable and permanent family unit." *Id.* at 452, 313 *N. E.* 2d at 758. It concluded in reasoning pertinent here, that

an ordinance may restrict a residential zone to occupancy by stable families occupying single-family homes, but neither by express provision nor construction may it limit the definition of family to exclude a household which in every but a biological sense is a single family. The minimal arrangement to meet the test of a zoning provision, as this one, is a group headed by a householder caring for a reasonable number of children as one would be likely to find in a biological unitary family.  [*Id* at 453, 313 *N. E.* 2d at 758]

Inherent in the above well-reasoned passage is an awareness of the fact that "[t]he concept of a one family dwelling is based upon its character as a single housekeeping unit." 3 *Rathkopf, The Law of Zoning and Planning* 200 (Supp. 1975). We adopt this reasoning and conclude that by its force, without resort to the protective legislation concerning group homes, that portion of the Mantoloking ordinance imposing what we find to be an unduly restrictive definition of the concept of "family," must fall.

It is our judgment that Graewill House need not cease its operation; that it violates neither restrictive covenants of record, nor the Borough's zoning provisions, the latter, to the extent indicated above, having been held invalid. Accordingly all forms of relief sought by plaintiffs are denied.

Judgment is affirmed.

CONFORD, P. J. A. D., Temporarily Assigned (dissenting). I am of the view that plaintiffs are entitled to injunctive relief because the State is conducting a therapeutic, institutional operation on the former Graessle property which violates the letter and the spirit of the valid neighborhood scheme created by the restrictions and covenants in the deeds mentioned in the majority opinion.

To say that this building is now used as a "dwelling" within the intent of the restrictions simply because 12 children live there (each for several months at a time) and to ignore the fact that the children are regularly and systematically afforded special therapeutic, nursing and educational attention, as well as ordinary care, by a State-employed staff of half a dozen people, is to close one's eyes to the fact that in every significant and realistic sense this is an

institutional use and therefore an egregious violation of the neighborhood scheme. Plaintiffs in purchasing their respective properties for homes had every reasonable expectation of judicial protection of the integrity of that neighborhood scheme, and this notwithstanding the indisputably beneficent function the structure is now serving. I agree with plaintiffs' plea that such institutions should be located where they do not intrude on property rights; and if it is felt for any reason that they must, that the State should condemn the private property interests affected and make compensation therefor. *Duke v. Tracy,* 105 *N. J. Super.* 442 (Ch. Div. 1969); 2 *American Law of Property* (1952) § 9.40, p. 449–450.

I am conscious of the rule invoked by the court that land restrictions are ordinarily strictly construed, but the case to which reference is had, *Bruno v. Hanna,* 63 *N. J. Super.* 282 (App. Div. 1960), also states that "the rule of strict construction will not be applied to defeat the obvious purpose of a restriction." *Id.* at 287. Moreover, it is cardinal that where a common scheme exists, the court must consider the objects and purposes of the original promoters and the circumstances under which the restrictions were created. *De Gray v. Monmouth Beach Club House Co.,* 50 *N. J. Eq.* 329, 341–43 (Ch. 1892), aff'd, 67 *N. J. Eq.* 731 (E. & A. 1894); *Petersen v. Beekmere, Incorporated,* 117 *N. J. Super.* 155, 168–69 (Ch. Div. 1971); see *Riverton Country Club v. Thomas,* 141 *N. J. Eq.* 435, 440 (Ch. 1948), aff'd 1 *N. J.* 508 (1948); *Wagenheim v. Willcox,* 105 *N. J. Super.* 263, 266 (Ch. Div. 1969); cf. *Hammett v. Rosensohn,* 26 *N. J.* 415, 423 (1958).

Conceding, *arguendo,* that the rule of strict construction would not treat the deed restrictions here as prohibitive of more than one family in a dwelling,[1] there can be no reason-

---

[1]But note that in the *Bruno* case, *supra,* which apparently so held, the court mentioned the reference by the trial court to the fact that numerous multi-family dwellings in the area of the subject property confirmed the concordant practical interpretation of the deed lan-

able dispute from the history and practical construction of the restrictions for over 50 years that they at least prohibit the conduct on the premises of an occupation, as distinguished from a dwelling. Nor can it be gainsaid that, albeit a public one, an occupation is being carried on here. To say that because people live in the structure it is therefore necessarily a "dwelling" rather than an institution. would, by the same logic, validate nursing homes, boarding houses or schools and psychiatric clinics as "dwellings", and not offensive to this neighborhood scheme. Clearly, the law is to the contrary. *Rosenblatt v. Levin,* 127 *N. J. Eq.* 207 (Ch. 1940), aff'd 129 *N. J. Eq.* 103 (E. & A. 1940); *Nerrerter v. Little,* 258 *Mich.* 462, 243 *N. W.* 25 (Sup. Ct. 1932).

Against the background of this operation, where children are kept for a few months until improved to the point of being placeable in a foster home or other facility, and are no part of the normal surrounding community, the property has become an agency for treatment of children, not their "dwelling", within the true intent and purpose of the restrictive scheme, reasonably interpreted.

Applying the foregoing precepts to the convincing evidence adduced by plaintiffs concerning the original objects and purposes of these restrictions, and their practical construction ever since, there can be no fair doubt that the current use of this property violates the neighborhood scheme. The resulting damage to plaintiffs is obvious and substantial, as amply attested by the record.

In view of the foregoing, I would enjoin the violation of the neighborhood scheme, and find it unnecessary to consider the matter of the asserted zoning violation.

*For affirmance*—Chief Justice HUGHES and Justices MOUNTAIN, SULLIVAN, PASHMAN and SCHREIBER—5.

*For reversal*—Judge CONFORD—1.

---

guage. 63 *N. J. Super.* at 285. The practical construction of the instant restrictions, however, has uniformly been for single-family dwellings only.