LITTLE NECK COMMUNITY ASSOCIATION et al., Appellants, v WORKING ORGANIZATION FOR RETARDED CHILDREN, Also Known as WORC, Respondent, et al., Defendants.

Second Department, May 3, 1976

*Edward J. Ledogar* (*Thomas R. Devaney* on the brief), for appellants.

*Murray B. Schneps* for respondent.

TITONE, J. In this action, plaintiffs, a number of property owners and their community organization, seek to enjoin the respondent Working Organization for Retarded Children (WORC) from using a one-family residence as a group home for mentally retarded children. The subject premises which WORC contracted to purchase, and to which it acquired title during the pendency of this action, is located in a one-family residential zone in Little Neck, Queens.

In granting WORC's motion for summary judgment, the Special Term held that the proposed group home was a permitted use in a single-family residential zone since its future occupants will constitute a "family" within the definition of that term set forth in the New York City Zoning Resolution. That resolution defines a "family" as: "Not more than four unrelated persons occupying a dwelling, living together and maintaining a common household" (NY City

Zoning Resolution, § 12-10). Thus, the focal issue is whether a group home for retarded children constitutes a "family" within the purview of the New York City Zoning Resolution.

The respondent WORC, a not-for-profit corporation, approved by the New York State Department of Social Welfare, is authorized to operate a "group home" program for mentally retarded children (see Social Services Law, § 374-c). As set forth in the Social Services Law, a "group home" is "a facility for the care and maintenance of not less than seven, nor more than twelve children, who are at least five years of age" (Social Services Law, § 371, subd 17). The rules of the Department of Social Welfare set forth extensive requirements with which the operator of the group home must comply in order to receive operating certification. It is noteworthy that the rules specify that the "group home shall be in *an appropriate neighborhood and so located that it is readily accessible to religious, school and recreational facilities and other community resources"* (18 NYCRR 11.3 [d] [1]; emphasis supplied).

In *City of White Plains v Ferraioli* (34 NY2d 300), Abbott House, a not-for-profit membership corporation licensed by the New York State Department of Social Welfare to care for neglected and abandoned children, sought to operate a group home for 10 foster children in an "R-2" single-family residential zone pursuant to the identical statutory authority involved herein. The city sought to enforce its zoning ordinance and to enjoin use of the single-family house purchased for this purpose, contending that the group home was not a single-family use, but either a philanthropic institution, allowed only by special permit, or a boarding house, wholly excluded from an "R-2" zone. The Court of Appeals stated that the narrow issue was whether the "group home", consisting of a married couple and their two children, together with 10 foster children, qualified as a single "family" unit, under the ordinance. The ordinance defined a "family" as "one or more persons limited to the spouse, parents, grandparents, grandchildren, sons, daughters, brothers or sisters of the owner or the tenant or of the owner's spouse or tenant's spouse living together as a single housekeeping unit with kitchen facilities."

The unanimous court concluded that the group home was a family for the purpose of a zoning ordinance. It observed that (pp 304-306):

"It is significant that the group home is structured as a single housekeeping unit and is, to all outward appearances, a

relatively normal, stable and permanent family unit, with which the community is properly concerned. * * *

"The group home is not, for purposes of a zoning ordinance, a temporary living arrangement as would be a group of college students sharing a house and commuting to a nearby school (cf. *Village of Belle Terre v Boraas,* 416 U.S. 1). * * * The group home is a permanent arrangement and akin to a traditional family, which also may be sundered by death, divorce, or emancipation of the young. Neither the foster parents nor the children are to be shifted about; the intention is that they remain and develop ties in the community. The purpose is to emulate the traditional family and not to introduce a different 'life style'. * * *

"So long as the group home bears the generic character of a family unit as a relatively permanent household, and is not a framework for transients or transient living, it conforms to the purpose of the ordinance * * *. Moreover, in no sense is the group home an institutional arrangement, which would be another matter. Indeed, the purpose of the group home is to be quite the contrary of an institution and to be a home like other homes."

The appellants contend that the present case may be distinguished from *Ferraioli* since the children who will occupy the proposed group home are retarded. They assert that the proposed group home will resemble a mini-institution because the children's handicap will necessitate special care, that their retardation will inhibit them from interacting (among themselves) as people in a normal family do and that they will be unable to participate in normal activities with the community at large. While professing to be sympathetic to the plight of these unfortunate children, the appellants nevertheless suggest that the proposed group home should be located in a residential zone other than one restricted to single-family homes. They also suggest that retarded children are not denied access to single-family residential zones since they are free to live in such zones with their natural parents.

WORC contends that it has the right to locate the "State-created" family known as a group home in a single-family residential zone. It argues that, notwithstanding the fact that the children residing therein will suffer from mental retardation, the proposed group home will possess the same attributes as a conventional family, including permanency, community participation and life style. It further asserts that certain

modifications of the New York City Building Code relating to the structural requirements of group homes explicitly recognizes this fact. In addition, WORC contends that the definitional test has nothing to do with the normalcy of the occupants of a group home; if it were precluded from locating its proposed home in a single-family residential zone because of the retardation of the children, then the mentally retarded would be denied equal protection of the laws simply because of their affliction.

The term "family" is subject to numerous definitions in zoning ordinances. Courts have often been called upon to determine whether a "family" exists in the context of a particular situation (see Ann 172 ALR 1172). It is our opinion that a group home for mentally retarded children constitutes a family for the purposes of a zoning ordinance. Our decision is based primarily upon the fact that a group home which is organized pursuant to the Social Services Law is specifically designed to emulate in appearance a reasonably sized biological unitary family. "Zoning is intended to control types of housing and living and not the genetic or intimate internal family relations of human beings" (*City of White Plains v Ferraioli, supra,* p 305). Although a municipality may exercise its police power to enact single-family residential zones segregated from multiple dwelling houses (see, e.g., *Baddour v City of Long Beach,* 279 NY 167), we are not persuaded that the proposed group home will, in and of itself, alter the quality of life or the character of the neighborhood which a single-family residential zone is specifically designed to protect and enhance.

The proposed group home will neither provide accommodations for transients nor introduce a life style which is repugnant to traditional family values (cf. *Village of Belle Terre v Boraas,* 416 US 1). Rather, it will provide retarded children with a stable environment in a setting in which they will have a real opportunity to develop to their full potential. Furthermore, we see no effect upon this status if the house parents are provided on a rotating basis.

We are fully aware that mental retardation involves a mental disability and that the State has traditionally provided services to the mentally disabled, and particularly the mentally retarded, in the role of *parens patriae.* Institutionalization has been the traditional means of accommodating and caring for the mentally retarded (see Mental Hygiene Law,

§ 7.15). However, the recent trend has been toward the establishment of community residence programs for the mentally disabled, including mentally retarded children (see, e.g., Mental Hygiene Law, § 1.05, subds 18, 24; § 13.01, eff Apr. 1, 1976). Indeed, the regulations of the Department of Mental Hygiene recognize the State's continued interest in these individuals and require certification of the group home for retarded children to indicate compliance with its regulations as well as with those of the Department of Social Welfare (14 NYCRR 86.4 [b]). This procedure is consistent with the recognition that retarded children have special needs related to their handicap and that the provider of services to these children must be subject to regulatory oversight. However, this fact does not alter our expressed view that a group home for mentally retarded children constitutes a family for the purposes of a zoning ordinance. Although WORC will provide services to children who would otherwise be subject to institutionalization, the services will be provided in a noninstitutional environment.

Assuming, *arguendo*, that a group home for retarded children does not constitute a family, we would nevertheless conclude that the proposed home is a permitted use as of right. The New York Zoning Resolution provides that, except in certain community districts, a health related facility, as defined by the New York State Hospital Code, is a permitted use as of right in a single-family residential zone (NY City Zoning Resolution, § 22-13). A "health related facility" includes, *inter alia,* a facility providing lodging, board and social and physical care to six or more residents (10 NYCRR 700.2 [a] [4]). In view of the fact that the regulations of the Department of Mental Hygiene treat the group home as a residential facility for the mentally disabled, it falls within the definitional category of a health related facility. Since the property WORC has purchased is located in Community District 11 in Queens, and as that district is not subject to special permit requirements, the proposed group home would be a permitted use even if we were not to conclude that it falls within the definitional category of a family (see NY City Zoning Resolution, § 74-903).

In view of the above, we need not reach any other issue. Accordingly, the order of the Special Term should be affirmed. The order of this court enjoining WORC from making structural changes in the house is hereby vacated.

HOPKINS, Acting P. J., LATHAM, CHRIST and HAWKINS, JJ., concur.

Order of the Supreme Court, Queens County, dated September 23, 1975, affirmed, with $50 costs and disbursements, and the stay contained in the order of this court, dated October 29, 1975, is hereby vacated.