Mitchell H. COSTLEY, et al.,
Appellants (81–279),

v.

CAROMIN HOUSE, INC., Respondent,

City of Two Harbors, Respondent,

and

Lori Marie Osbakken, etc., et al.,
applicants for intervention,
Appellants (81–403).

Nos. 81–279, 81–403.

Supreme Court of Minnesota.

Dec. 11, 1981.

---

Delaney, Thompson & Solum and John W. Lundquist, Minneapolis, for Costley, et al.

Stephen E. Scott and Eric S. Janus, Developmental Disabilities Advocacy Project, Minneapolis, for Osbakken, etc., et al.

Friedman, Nord & Paulson and Larry M. Nord, Duluth, for Caromin House, Inc.

Donovan, McCarthy, Crassweller, Larson & Magie and Michael W. Haag, Duluth, Kenneth A. Sandvik, City Atty., Two Harbors, for City of Two Harbors.

Warren Spannaus, Atty. Gen., Alan Held and Ellen Dubuque, Sp. Attys. Gen., St. Paul, Stephen Scott and Eric Janus, ARC and North Shore Assoc., Minneapolis, for amicus curiae.

SCOTT, Justice.

This is a combined appeal from the denial of a temporary injunction sought by neighbors wishing to prohibit the construction of a home for mentally retarded adults in the City of Two Harbors, Minnesota, and the denial of a timely motion to intervene by four mentally retarded persons by the Lake County District Court. We affirm in part and reverse in part.

Respondent Caromin House, Inc. (Caromin House), a Minnesota corporation entirely owned by Garry and Gertrude Carlson, planned to operate a home for mentally retarded adults in Two Harbors, Minnesota. Land was purchased from the City of Two Harbors (City) for that purpose in December 1979. The Eighth Addition, in which the land is located, is a new subdivision platted in 1977 and 1978. Since the platting, approximately 20 single-family residences have been constructed in the Eighth Addition. Plaintiff Costley moved into the Eighth Addition in 1978. All six plaintiffs reside there. The subdivision is zoned R–2, which permits one- and two-family dwellings. In addition, the City imposed restrictive covenants on the property, limiting usage to one dwelling and one garage.

The group home planned by Caromin House would be the only facility in all of Lake County to provide a home for mentally retarded adults. Six retarded adults and their houseparents would live in the home.

From the exterior, the building would be indistinguishable from any other single-family dwelling in the subdivision. The interior would have five bedrooms, three baths, a living room, a dining room, a kitchen, a basement utility-furnace-storage area, and a basement recreation room. All residents would live together as a family, sharing all parts of the house except individual bedrooms. The purpose of the home is to provide a non-institutional living situation for mentally retarded adults. All of the residents, including the houseparents, would share in such family functions as preparing and eating meals, planning outings, and performing household duties, all in compliance with applicable state regulations. 12 MCAR § 2.034 (1978).

Caromin House followed all necessary administrative procedures and obtained all necessary permits for construction of the home, including a Certificate of Need from the Minnesota Department of Health and approval of the location by the Minnesota Department of Public Welfare. In the course of this process, the City expressed to the Residential Licensing Supervisor its concern that the project would be a commercial enterprise or boarding house that would violate the City of Two Harbors Zoning Ordinance. The Minnesota Attorney General, in an informal written opinion, responded that Minn.Stat. §§ 462.357, subd. 7, and 245.812, subd. 3,[1] applied to the project and therefore the proposed group home would not violate the city zoning ordinance. Under these statutes, a state-licensed group home serving six or fewer mentally retarded persons shall be considered a single-family residential use for the purpose of zoning.

---

1. These statutes provide as follows:
 Minn.Stat. § 462.357, subd. 7 (1980):
 Permitted single family use. In order to implement the policy of this state that mentally retarded and physically handicapped persons should not be excluded by municipal zoning ordinances from the benefits of normal residential surroundings, a state licensed group home or foster home serving six or fewer mentally retarded or physically handi-

capped persons shall be considered a permitted single family residential use of property for the purposes of zoning.
Minn.Stat. § 245.812, subd. 3 (1980):
 A licensed residential facility serving six or fewer persons or a licensed day care facility serving ten or fewer persons shall be considered a permitted single family residential use of property for the purposes of zoning.

The Board of Zoning Appeals issued the necessary zoning permit to Caromin House on October 16, 1980, reversing the denial of the permit by the zoning administrator. While the zoning administrator had felt the project was a commercial venture, the decision of the board was "based to a large degree on the Minnesota statutes" that mandate that such a group home be considered a single-family residential use for the purpose of zoning.

On October 23, 1980, one week after the zoning permit was granted, plaintiffs obtained ex parte a temporary restraining order against construction of the group home while they sought a temporary injunction. Lori Osbakken, et al., four mentally retarded persons, through their guardians filed a timely motion to intervene. All four were potential future residents of the home and now reside there. The Lake County District Court denied both the motions for a temporary injunction and for intervention.

Plaintiffs appeal the denial of a temporary injunction on the grounds that the home is prohibited by the local zoning laws and by the applicable restrictive covenant and that Minn.Stat. §§ 462.357, subd. 7, and 245.812, subd. 3 (1980), characterizing a group home as single-family use, are unconstitutional. Applicants for intervention appeal the denial of their motion for intervention on the ground that the trial court either improperly denied intervention as of right or abused its discretion in refusing to permit intervention. Defendant City of Two Harbors takes no position on the issue of a temporary restraining order. A counter-claim by Caromin House against plaintiffs for damages was not decided below and is not before this court.

The following issues are therefore presented:

(1) Does a group home for six retarded adults and two resident houseparents comply with the Two Harbors Zoning Ordinance as being a single-family dwelling?

(2) Does the group home comply with the applicable restrictive covenant?

(3) Did the trial court err in denying the temporary injunction?

(4) Did the trial court err in denying the motion for intervention?

1. Plaintiffs contend that the group home violates the zoning ordinance because a group of persons unrelated by blood, marriage, or adoption cannot be a family. The home is located in an area zoned R–2, which permits "one and two-family dwelling groups," according to Article 6, Section 2.02. "Dwelling, single-family" is defined in Article 2, Section 1.12, as "[a] building designed for occupancy by one family."

While plaintiffs argue that the word "family" must be given "its ordinary meaning," we have stated:

> The word "family" has many different common meanings and perhaps as many legal definitions as there are fields of law in which it is used. * * * [T]he meaning necessarily depends upon the field of law in which the word is used, the purpose intended to be accomplished by its use, and the facts and circumstances of each case."

*LeRoux v. Edmundson*, 276 Minn. 120, 123, 148 N.W.2d 812, 814 (1967). Here, the zoning ordinance itself defines family:

> Family: One or more persons occupying a premises and living as a single housekeeping unit as distinguished from a group occupying a boarding house, lodging house or hotel as herein defined.

Two Harbors, Minn., Ordinance No. 253, Art. 2, sec. 1.16 (Oct. 15, 1979). The residents of Caromin House will constitute a family, therefore, if they live in a single housekeeping unit.

In order to qualify for state licensure,[2] the group home must function as a single housekeeping unit. The licensing requirements of the Department of Public Welfare, 12 MCAR § 2.034 (1978), ensure that the mentally retarded residents and house-

---

**2.** A license is required under Minn.Stat. § 245.-783, subd. 1 (1980).

parents will operate as a family.[3] The residents of Caromin House share in planning and preparation of meals, performing housekeeping duties, and planning recreational activities. The houseparents provide supervision, guidance, and emotional support to the residents as would any head of household. Such a family setting differs from a boarding home, a lodging house, or a hotel which, as the zoning ordinance defines, provide limited services of food or lodging only.

Interpreting a similar ordinance in *Oliver v. Zoning Commission*, 31 Conn.Supp. 197, 326 A.2d 841 (1974), a lower Connecticut court held that a residence for eight or nine mentally retarded adults and two supervisory houseparents constituted a single housekeeping unit and was a permitted single-family use. Courts have determined that almost any living arrangement that makes use of unified housekeeping facilities satisfies such an ordinance. 2 Rathkopf, The Law of Zoning and Planning § 17A.03[3][a] (1981).

■ Even where local zoning ordinances have required persons to be related in order to be a family, courts have held that a group home was a single-family dwelling. *See, e. g., Hessling v. City of Broomfield*, 193 Colo. 124, 563 P.2d 12 (1977); *Berger v. State*, 71 N.J. 206, 364 A.2d 993 (1976); *City of White Plains v. Ferraioli*, 34 N.Y.2d 300, 313 N.E.2d 756, 357 N.Y.S.2d 449 (1974). *See also*, 2 Anderson, American Law of Zoning § 9.31 (2d ed. 1968 & Supp. 1981); 2 Rathkopf, The Law of Zoning and Planning § 17A.05[2][b] (1981); Annot., 71 A.L.R.3d 693 (1976). The word "family" is no longer limited to a traditional concept of marriage and biological ties. As the court in *Ferraioli* stated in recognizing a group home including ten foster children as a single-family unit, "So long as the group home bears the generic character of a family unit as a relatively permanent household, and is not a framework for transients or transient living, it conforms to the purpose of the ordinance." 34 N.Y.2d at 305–06, 313 N.E.2d at 758, 357 N.Y.S.2d at 453. The Caromin House group home is therefore a single-family unit within the ordinance.

Operation of the group home by a for-profit corporation does not change the preceding analysis. Although Caromin House receives compensation for its services, the home does not thereby become commercial in nature. The residents interact and live as a family whether the management is by a for-profit corporation, a non-profit corporation, a religious group, or a governmental unit.

Plaintiffs' reliance on *Browndale International Ltd. v. Board of Adjustment*, 60 Wis.2d 182, 208 N.W.2d 121 (1973), is misplaced. The court's decision in *Browndale* that therapeutic homes for emotionally disturbed children were not single-family use was influenced not only by the commercial nature but also by other factors: the houseparents did not live in the house; psychiatric and medical treatment was a primary purpose of the facility; children stayed for only short terms; and six facilities were concentrated in an area that more closely resembled an institutional complex than a number of single-family dwellings. The profit nature alone would not alter the objective of providing noninstitutional living for mentally retarded persons; the home still serves a residential purpose.

The Two Harbors Zoning Ordinance prohibits in an R–2 district every use that is not specifically permitted. Article 6, Section 2. Since the group home fits within the definition of single-family dwelling that is a permitted use, it cannot be prohibited as a commercial activity. The home is therefore permitted in Two Harbors' R–2 zone.

---

**3.** The regulations are designed to "establish and protect the human right of mentally retarded persons to a normal living situation." 12 MCAR § 2.034 A.2 (1978). The living unit "shall be small enough to ensure the development of meaningful interpersonal relationships among residents and between residents and staff." 12 MCAR § 2.034 B.1.a. (1978). "Living-unit staff shall be responsible for the development and maintenance of a warm, family, or homelike environment that is conducive to the achievement of optimal development by the resident. 12 MCAR § 2.034 B.3.b.(1) (1978).

2. Plaintiffs also contend that the group home violates the restrictive covenant applicable to the property which provides: "Only one dwelling and one garage is permitted to be constructed on each lot." "Dwelling" is undefined. Plaintiffs would interpret this limitation to permit only a "residential, single-family dwelling" and then argue that the group home violates that covenant.

Restrictive covenants are strictly construed against limitations on the use of property. *Mission Covenant Church v. Nelson*, 253 Minn. 230, 233, 91 N.W.2d 440, 442 (1958). Since the law favors the unrestricted use of property, courts will not adopt a strained construction in favor of restrictions. *Id.* According to Webster's Third New International Dictionary (1971), a dwelling is simply "a building or construction used for residence." The group home fits this description both in appearance and in use, and thus complies with the covenant.

Even if the covenant were interpreted to permit only "single-family dwellings," the group home would be a permitted use under the same reasoning as discussed above for the definition of "family" in zoning regulations. From the outside, the home looks like all the other single-family homes in the neighborhood. The residents live in a family-type setting and call the dwelling their home. Courts in other jurisdictions have found similar group homes in compliance with single-family restrictive covenants. *State ex rel. Region II Child & Family Services, Inc. v. District Court of the Eighth Judicial District*, 609 P.2d 245 (Mont.1980) (five retarded children; one unit single-family dwelling); *Bellarmine Hills Association v. Residential Systems Co.*, 84 Mich.App. 554, 269 N.W.2d 673 (1978) (six retarded children; one single private family dwelling); *Berger v. State*, 71 N.J. 206, 364 A.2d 993 (1976) (eight to twelve multi-handicapped children under age nine; one dwelling house). Factors considered by the courts include the single housekeeping structure, the relatively permanent type of living situation, and public policy supporting such living arrangements—all factors applicable to Caromin House.

That Caromin House is compensated for its services does not change the character of the use from that of a dwelling. Deciding that a group home for four retarded adults fit within a covenant restricting use to residential purposes and one single-family dwelling, the North Carolina Supreme Court stated as follows:

That [the group home] is paid for its efforts does not detract from the essential character of its program of non-institutional living for the retarded. Clearly, the receipt of money to support the care of more or less permanent residents is incidental to the scope of [its] efforts.

*J. T. Hobby and Son, Inc. v. Family Homes of Wake County, Inc.*, 302 N.C. 64, 274 S.E.2d 174 (1981). The for-profit status of Caromin House is similarly irrelevant. *See Crowley v. Knapp*, 94 Wis.2d 421, 288 N.W.2d 815 (1980) (for-profit group home for retarded adults complies with covenant restricting use to single-family dwelling used for residential purposes only). The home meets the restriction of "dwelling" whether we look at the express language or at cases involving group homes.

3. Since a lower court's ruling on a motion for a temporary injunction is largely an exercise of judicial discretion, the question on appeal is whether there was a clear abuse of such discretion. *Eakman v. Brutger*, 285 N.W.2d 95 (Minn.1979). In *Dahlberg Brothers, Inc. v. Ford Motor Co.*, 272 Minn. 264, 274–75, 137 N.W.2d 314, 321–22 (1965), this court specified five factors to be considered in making that determination:

(1) The nature and background of the relationship between the parties preexisting the dispute giving rise to the request for relief.

(2) The harm to be suffered by plaintiff if the temporary restraint is denied as compared to that inflicted on defendant if the injunction issues pending trial.

(3) The likelihood that one party or the other will prevail on the merits when the fact situation is viewed in light of established precedents fixing the limits of equitable relief.

(4) The aspects of the fact situation, if any, which permit or require consideration of public policy expressed in the statutes, State and Federal.

(5) The administrative burdens involved in judicial supervision and enforcement of the temporary decree.

Since the group home is permissible under the zoning laws and the applicable restrictive covenant, plaintiffs are unlikely to prevail on the merits. It is therefore unnecessary for us to reach the question of the constitutionality of the statutes. However, since the district court relied on the statutory classification of a group home as a single-family use for zoning purposes in denying the temporary injunction, we now consider whether this reliance was an abuse of discretion.

■ Since the group home must be licensed before it can operate, Minn.Stat. §§ 462.357, subd. 7, and 245.812, subd. 3, apply. These statutes specify that a licensed group home for six or fewer mentally retarded persons shall be considered a single-family residential use for zoning purposes. Plaintiffs argue that these statutes are an arbitrary and capricious imposition of legislative will upon local zoning matters and therefore unconstitutional as a violation of due process. In Minnesota, however, a municipality has no inherent power to enact zoning regulations. A municipality receives power to zone only by legislative grant of authority by the state. Minn.Stat. § 462.357 (1980); *Denney v. City of Duluth*, 295 Minn. 22, 26, 202 N.W.2d 892, 894 (1972). In exercising such a delegation of power, a municipality cannot exceed the limitations imposed by the enabling legislation. *Reilly Tar & Chemical Corp. v. City of St. Louis Park*, 265 Minn. 295, 300, 121 N.W.2d 393, 396 (1963). The grant of authority for local zoning in Minn.Stat. § 462.-357 includes subdivision 7 as a term of that grant. Two Harbors' zoning ordinance, therefore, dependent on state statute for its zoning authority, is required by that same statute to treat licensed group homes for six or fewer mentally retarded persons in the same manner as it treats all single-family residences.

■ Whether the statute is unreasonable or arbitrary is a question primarily for the legislative body concerned, and unless the decision of that body on that question appears to be clearly erroneous, courts will not interfere. *State v. Edwards*, 287 Minn. 83, 177 N.W.2d 40 (1970). The Minnesota Legislature has enacted the statutes at issue as part of a broad program, on the state and national level, to de-institutionalize mentally retarded persons and return them to the community. The national program is expressed in the Developmental Disabilities Assistance and Bill of Rights Act, 42 U.S.C. §§ 6000–6081 (1976 & Supp.1979). Section 6010 provides:

> The treatment, services, and habilitation for a person with developmental disabilities should be designed to maximize the developmental potential of the person and should be provided in the setting that is least restrictive of the person's personal liberty.

42 U.S.C. § 6010(2) (1976). The Minnesota Commissioner of Public Welfare has committed the state to a major program of de-institutionalization in the consent decree in *Welsch v. Noot*, No. 4–72 Civ. 451 (D.Minn., Sept. 15, 1980). The zoning statutes guarantee that local governments cannot frustrate state and national policy of permitting mentally retarded persons to participate in normal residential communities.

Minnesota is one of an increasing number of states that have enacted legislation designed to facilitate acceptance of group homes in residential communities.[4] Courts have upheld the statutes on the ground that they bear a substantial relation to a legitimate governmental objective and embody a subject of statewide concern which justifies municipality's power to bar group homes from single-family districts.

---

4. 2 Rathkopf, The Law of Zoning and Planning § 17A.05(c) n.45 (1981) lists nineteen states with statutes that either revoke or curtail a

the overriding of local controls.[5] The trial court's reliance on the statute was therefore not in error.

Plaintiffs have also failed to demonstrate that they would suffer irreparable harm if the temporary injunction were denied. A trial court cannot enjoin what a party only assumes, *Thompson v. Barnes*, 294 Minn. 528, 534, 200 N.W.2d 921, 926 (1972), or fears will be a possible result, *J. F. Quest Foundry Co. v. International Molders & Foundry Workers Union, Local No. 132*, 216 Minn. 436, 13 N.W.2d 32 (1944). The affidavits do not establish that the group home would threaten the safety of plaintiffs' children or reduce the value of plaintiffs' property. The building itself causes no harm to the plaintiffs since it looks no different from any other in the neighborhood.

Permitting the construction of the group home is consistent with the public policy of bringing mentally retarded persons out of the institutions and recognizing their rights to live as normal lives as possible. The denial of the temporary injunction was not an abuse of discretion.

4. Four mentally retarded persons (Residents) moved to intervene both as of right, under Minn.R.Civ.P. 24.01, and by permission, under Minn.R.Civ.P. 24.02. The trial court denied intervention, stating that Residents are adequately represented, their interest is too speculative and remote, and their briefs would only duplicate those already filed.

Rule 24.01 provides for intervention as of right:

Upon timely application anyone shall be permitted to intervene in an action when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

In determining whether intervention is proper, the court will, absent sham or frivolity, accept the allegations in the pleadings as true. *Snyder's Drug Stores, Inc. v. Minnesota State Board of Pharmacy*, 301 Minn. 28, 31, 221 N.W.2d 162, 164 (1974). Residents, in their pleadings and accompanying affidavits, state that the group home will give them a local family-type setting in which to live, rather than inappropriate institutional settings or out-of-town residences. All were appropriate candidates for the home, and placement of at least one was a "virtual certainty." The group home will provide the residents with the environment necessary to become more self-reliant.

Caromin House does not adequately represent the interest of the Residents and does not pretend to do so. Although Caromin House is interested in constructing a group home as an investment, it apparently has no ties to this particular neighborhood. For the Residents, the location in Two Harbors, near friends and family, is important. Caromin House has no duty to the Residents before the home is in operation and they reside in it. In contrast, the Residents have a vital interest in being able to live in and participate in this community.

We have followed the policy of encouraging all legitimate interventions. *Engelrup v. Potter*, 302 Minn. 157, 166, 224 N.W.2d 484, 489 (1974); *Avery v. Campbell*, 279 Minn. 383, 389, 157 N.W.2d 42, 46 (1968). In discussing the federal rule identical to Rule 24.01, Professors Wright and Miller state as follows:

[I]f [the applicant's] interest is similar to, but not identical with that of one of the parties, a discriminating judgment is required on the circumstances of the particular case, but he ordinarily should be allowed to intervene unless it is clear that the party will provide adequate representation for the absentee.

*Thelen v. City of Missoula*, 168 Mont. 375, 543 P.2d 173 (1975); *Zubli v. Community Mainstreaming Assoc., Inc.*, 102 Misc.2d 320, 423 N.Y.S.2d 982 (1979).

---

5. *See, e. g., City of Los Angeles v. Dep't of Health*, 63 Cal.App.3d 473, 133 Cal.Rptr. 771 (1976); *Adams County Ass'n for Retarded Citizens, Inc., Etc. v. City of Westminster*, 196 Colo. 79, 580 P.2d 1246 (1978); *State ex rel.*

7 A C. Wright & A. Miller, Federal Practice & Procedure, § 1909, at 524 (1972). *See also Natural Resources Defense Council, Inc. v. United States Nuclear Regulatory Commission*, 578 F.2d 1341, 1346 (10th Cir. 1978) (quoting Wright & Miller). Since Residents have the necessary interest and are inadequately represented, the denial was not justified. Nor would intervention unduly delay or prejudice the rights of other parties.

The denial of the temporary injunction is affirmed. Since the group home is within the definition of a family as a single housekeeping unit, it is a permitted use in the R–2 zone. The group home also satisfies the restrictive covenant since it is a dwelling.

The denial of the motion to intervene is reversed.