CRANE NECK ASSOCIATION, INC., et al., Respondents, v NEW YORK CITY/LONG ISLAND COUNTY SERVICES GROUP et al., Appellants, et al., Defendants.

Second Department, March 7, 1983

**APPEARANCES OF COUNSEL**

*Robert Abrams, Attorney-General (Thomas P. Dorsey, Robert S. Hammer* and *Robert L. Schonfeld* of counsel), for State appellants.

*Weber, Hoberman, Gross & Glueck (Steven J. Glueck* of counsel), for Jonathan Pool and another, appellants.

*Pelletreau & Pelletreau (Kevin A. Seaman* and *Benjamin L. Herzweig* on the brief), for respondents.

**OPINION OF THE COURT**

BROWN, J.

This litigation evolves out of the establishment of a community residence for eight mentally disabled adults by defendant New York City/Long Island County Services Group (NYC/LICSG), an agency of defendant New York State Office of Mental Retardation and Developmental Disabilities, at 3 Johns Hollow Road in the Hamlet of Crane Neck, Incorporated Village of Old Field.

In August of 1979, NYC/LICSG, acting pursuant to section 41.34 (subd [c], par [1], formerly subd [b], par [1]) of the Mental Hygiene Law (concerning site selection of community residential facilities), notified the Village of Old Field of its interest in establishing a community residence at the Johns Hollow Road location. The notification was accompanied by a detailed fact sheet as to the nature of the proposed residence. On September 18, 1979 the village conducted a public hearing in response to the notification, following which it registered a formal objection to the establishment of the residence.

On October 26, 1979 the Commissioner of Mental Retardation and Developmental Disabilities conducted a hearing pursuant to section 41.34 (subd [c], par [5], formerly subd [b], par [5]) of the Mental Hygiene Law. At the conclusion of the hearing the commissioner rejected the village's objections, determining, *inter alia,* that the proposed site would not substantially alter the surrounding area and would be appropriate for such a residence. That determination was subsequently confirmed by this court and the village's CPLR article 78 proceeding was dismissed (*Incorporated Vil. of Old Field v Introne,* 81 AD2d 906). Following the Commissioner's determination, NYC/LICSG entered into a lease of the premises with the owners, defendants Jonathan Pool and Bernard Grofman.

During the pendency of the special proceeding, plaintiffs, a homeowners association and certain individual homeowners who are, with one exception, residents of the Hamlet of Crane Neck, commenced the instant action seeking declaratory and injunctive relief to bar the governmental defendants from operating the community residence and to prohibit Pool and Grofman from leasing it for such purpose. Essentially, plaintiffs argued that such use would violate the terms of a restrictive covenant affecting the premises which barred construction or maintenance of *"any building other than single family dwellings"* (emphasis added).

The properties of the individual plaintiffs, as well as that of Pool and Grofman, were originally part of the estate of one Eversly Childs, who had acquired some 500 acres of land surrounding Crane Neck Point during the early part

of the century. During the 1930's the land was developed as Crane Neck Farm and for a period from 1945 onward, in order to maintain the character of the area and effectuate a common scheme of development, Mr. Childs and his estate imposed identical deed restrictions upon all parcels comprising Crane Neck Farm. These deed restrictions, which include the covenant at issue here, provide more fully:

"Subject to the following covenants and restrictions, which shall be construed as real covenants running with the land and shall be binding upon and enure to the benefit of the parties hereto, and their respective heirs, devisees, legal representatives, successors and assigns:

"(a) There shall not be constructed nor maintained upon the said premises any building other than single family dwellings and outbuildings * * *

"(d) That no part of said property nor any of the buildings to be erected thereon shall be used for any business purpose whatsoever and no goods or merchandise of any kind shall be manufactured, sold or kept for sale or exhibited thereon or therein and no business or trade shall be carried on or practiced on said premises or any part thereof and that no sign other than an 'owner identity sign' of an area of not over 200 square inches shall be erected nor shall any towers or other buildings be erected on the premises over 35 feet high * * *

"(f) It is understood that in the event the parties of the second part, their successors, or assigns, shall violate or fail to carry out any of the foregoing covenants and restrictions, proceedings to enforce compliance therewith by injunction or other means may be brought by the parties of the first part, their legal representatives, successors or assigns and failure to bring any such action or to take other proceedings shall not be held to be a waiver of any rights of the parties of the first part, their successors or assigns, to enforce compliance therewith.

"Anything hereinbefore contained to the contrary notwithstanding, the parties of the first part, their legal representatives, successors or assigns, shall have at all times the right and power to extinguish, modify, cancel or release any one or more of the foregoing covenants, restrictions or reservations."

Following joinder of issue, plaintiffs moved for summary judgment arguing, *inter alia,* that the covenant restricts not only the construction of buildings but their use as well; that even under a broad definition of the concept of "family", the proposed use is more akin to that of an institution than to the functional equivalent of a family; and that, notwithstanding the provisions of section 41.34 of the Mental Hygiene Law limiting the ability of localities to restrict the establishment of community residences for the mentally retarded through local ordinances, restrictive covenants constitute private property rights which must be observed by the State.

In opposing the motion, defendants asserted that the proposed use was not prohibited by the covenant and that, at best, the terms of the covenant are ambiguous as to whether the proposed use is a prohibited one and as to whether the term "family" as used therein was intended to exclude a community residence which is the functional equivalent of a family and, therefore, must be construed against those seeking its enforcement. They also argued that since the relief requested is equitable in nature, it should not be granted since it did not appear that the injury to plaintiffs would be serious or substantial if relief were denied, while if the relief were granted, it would result in great hardship to those sought to be restrained.

Special Term granted partial summary judgment to plaintiffs to the extent of declaring that the restrictive covenant must be construed to apply to both construction and use of residential buildings[1] and that the occupancy of the premises under the lease from Grofman and Pool to the governmental defendants was violative of the restrictive covenant. It further concluded, however, that questions of fact existed as to whether plaintiffs waived their rights under the covenant by virtue of their own violations of the same; whether they were estopped from enforcing the covenant due to laches or previous acquiescence in violations and whether the character of the neighborhood had

---

1. We are in agreement with Special Term that the restrictive covenant here applies not only to the construction and maintenance of single-family dwellings, but to their use as well (see *Baumert v Malkin,* 235 NY 115; *McCord v Pichel,* 35 AD2d 879).

changed to the extent that the covenant's object and purpose were no longer enforceable.

Special Term stated that subdivision (f) (formerly subd [e]) of section 41.34 of the Mental Hygiene Law, which provides that facilities such as the one in question shall be deemed "a family unit" for the purposes of local laws and ordinances, is inapplicable to private restrictive covenants. It concluded that "[t]his home as presently occupied is a public health-related facility, a creature of statute, sustained by public funds and monitored by government agencies. The sole purpose, however laudable, is the care of a group of unrelated individuals who are incapable of living independently or with a natural family and need continued uninterrupted supervision. To consider this group a family unit would undermine the thoughts, words and concepts of the formulators of the restrictive covenant."

We reverse. The establishment here of a community residence for eight mentally disabled adults under the provisions of sections 41.33 and 41.34 of the Mental Hygiene Law does not violate the provisions of the instant restrictive covenant limiting use of the premises to "single family dwellings". Moreover, it is our view that as a matter of public policy, such a private restrictive covenant as the one at bar may not be enforced so as to prevent the establishment of community residences under the Mental Hygiene Law.

Plaintiffs, in arguing for a narrow construction of the term "single family dwelling", assert that the group of persons residing in the community residence is significantly distinct from the traditional concept of "family" (i.e., a group of persons united by blood, marriage, historical and legal bonds) as was envisioned at the time the covenant was created.

While this traditional concept of family is the one which is most immediately recognizable, there is a significant body of law which holds that the term "family" may be construed to extend beyond this traditional, biological concept to encompass other groupings of individuals. In *City of White Plains v Ferraioli* (34 NY2d 300), the court was called upon to decide whether a group home consisting of a

married couple, their two children, and 10 foster children qualified as a single-family dwelling for one housekeeping unit in accordance with a local zoning ordinance. In upholding the establishment of the group home, the court recognized the proper purpose to be served by an ordinance limiting the uses in a zone to single-family units, but stated that (p 306) "neither by express provision nor construction may [such an ordinance] limit the definition of family to exclude a household which in every [sense] but a biological sense is a single family." Therefore, the court reasoned that for the purposes of determining whether a particular group residence complied with a single-family zoning requirement, it was necessary to look to the character of the grouping to see whether in theory, size, appearance and structure the group residence emulated the traditional family unit.

"So long as the group home bears the generic character of a family unit as a relatively permanent household, and is not a framework for transients or transient living, it conforms to the purpose of the ordinance * * * Moreover, in no sense is the group home an institutional arrangement, which would be another matter. Indeed, the purpose of the group home is to be quite the contrary of an institution and to be a home like other homes" (*City of White Plains v Ferraioli, supra,* pp 305-306).

The *Ferraioli* court's analysis of the problem of the establishment of group residences in areas zoned for single-family dwellings has been applied in a number of cases involving an assortment of groupings (see *Group House of Port Washington v Board of Zoning & Appeals of Town of North Hempstead,* 45 NY2d 266 [group home consisting of two permanent surrogate parents and seven children, with temporary replacements available for the surrogate parents]; *Little Neck Community Assn. v Working Organization for Retarded Children,* 52 AD2d 90, mot for lv to app den 40 NY2d 803 [group home for 7 to 12 retarded children organized to emulate a biological family unit]; *Incorporated Vil. of Freeport v Association for Help of Retarded Children,* 94 Misc 2d 1048, affd 60 AD2d 644 [community residence for eight retarded adults with house parents]).

There are also a number of decisions from sister States in which the courts have construed the term "family" in a restrictive covenant to encompass a group residence for mentally disabled individuals (*Crowley v Knapp*, 94 Wis 2d 421; *Costley v Caromin House*, __ Minn __, 313 NW2d 21; *Hobby & Son v Family Homes of Wake County*, 302 NC 64; *Leland Acres Homeowners Assn. v RT Partnership*, 106 Mich App 790; *Malcolm v Shamie*, 95 Mich App 132; *Bellarmine Hills Assn. v Residential Systems Co.*, 84 Mich App 554). It should be noted that the courts in these cases took cognizance of the strong public policy considerations in favor of establishing such group residences in reaching the conclusion that the groupings in question were families within the terms of the restrictive covenants (see, generally, What Constitutes a "Family" Within Meaning of Zoning Regulation or Restrictive Covenant, Ann., 71 ALR3d 693).

In New York, case law, insofar as it concerns the establishment of community residences for the mentally disabled in areas zoned for single-family dwellings, is now reflected in the provisions of the Padavan Law (Mental Hygiene Law, § 41.34, as added by L 1978, ch 468, § 2), which established guidelines and procedures to be followed in the process of selecting sites for such community residences. It is specifically provided therein that a "community residence established pursuant to [the statute] * * * shall be deemed a family unit, for purposes of local laws and ordinances" (Mental Hygiene Law, § 41.34, subd [f]).[2]

Plaintiffs argued, however, and Special Term agreed, that these statutory and case-law expansions of the term "family" in relation to zoning ordinances and local laws should not apply to the use of that term in the instant private restrictive covenant.

In support of their argument, plaintiffs rely primarily on the case of *Tytell v Kaen* (Supreme Ct, Bronx County, June 4, 1979, Di Fede, J., affd 77 AD2d 519, on opn of Di Fede, J.). In *Tytell,* the court was presented with a set of circumstances very similar to those at bar. The plaintiffs sought

---

2. A number of other States have enacted similar legislation to facilitate the acceptance and establishment of group residences in residential communities (see 2 Rathkopf, Law of Zoning and Planning [4th ed], § 17A.05[2][c]).

to bar the establishment of a group residence for eight mentally retarded children in a particular premises on the grounds that such use would violate both the local zoning ordinance and certain private restrictive covenants applicable to the premises. Special Term granted summary judgment to the plaintiffs, concluding that the proposed use would violate the restrictive covenants, which, *inter alia,* limited use of the premises to "one private dwelling house for the use of a single family", and specifically barred use as a "public or private home retreat, asylum, refuge, convent or school where any person may be treated, sheltered, cared for, instructed or taught" (slip opn, p 14). The court refused to apply the expanded concept of family as set forth in *City of White Plains v Ferraioli* (34 NY2d 300, *supra*), and its progeny to the use of that term in a private restrictive covenant. We decline to so limit our interpretation.

At the outset, in reviewing the scope of restrictive covenants, it must be recognized that covenants restricting the use of land are contrary to the general policy in favor of the free and unobstructed use of real property (*Premium Point Park Assn. v Polar Bar,* 306 NY 507), and, to that end, are to be strictly construed against those seeking enforcement (*Huggins v Castle Estates,* 36 NY2d 427, 430; *Buffalo Academy of Sacred Heart v Boehm Bros.,* 267 NY 242). If, upon examination, a covenant is found to be susceptible to two constructions, then the less restrictive construction will be adopted, with all doubts and ambiguities being resolved in favor of such less restrictive construction (*Aronson v Riley,* 87 AD2d 879; *Lewis v Spies,* 43 AD2d 714).

A fundamental purpose of group residences such as the one at bar is to move the care of mentally disabled persons away from institutional settings and toward less restrictive environments whenever that possibility exists. The residence here, which is structured for a small group of 6 to 8 residents, is intended to create "a small family type living experience" for those residents. To enable these residents to live as independently as possible within such a less restrictive environment, the program calls for, among other things, training in various activities of daily living, development of interpersonal relationships both within the

residence and with the surrounding community, and recreational activities. The goal is to establish a relatively permanent, stable environment, operating as a single household unit under a set of houseparents, which as much as possible bears the generic characteristics of the traditional family (*City of White Plains v Ferraioli,* 34 NY2d 300, *supra; Little Neck Community Assn. v Working Organization for Retarded Children,* 52 AD2d 90, mot for lv to app den 40 NY2d 803, *supra*).

As with the group residences under review in the *Ferraioli, Little Neck* and *Freeport* cases, it is the emulation of the traditional family unit which, in our opinion, satisfies the terms of the restrictive covenant, notwithstanding the lack of a biological or legal relationship among residents. The primary purpose of that covenant, preservation of the quality of life and character of the neighborhood, will not be contravened by the presence of this group residence (see *Little Neck Community Assn. v Working Organization for Retarded Children,* 52 AD2d 90, 94, *supra*). It will represent another "family" in the community. As the court in *Ferraioli* stated (p 306): "[T]he purpose of [this] group home is to be quite the contrary of an institution and to be a home like other homes."

Moreover, even were we to conclude that the definition of the term "family" as manifested in *Ferraioli* and its progeny (and in the provisions of the Mental Hygiene Law) should be applied only with respect to the application of local laws and ordinances and not to the use of the term "family" in a restrictive covenant, it is our opinion that as a matter of public policy the restrictive covenant in question may not be enforced so as to bar the establishment of this residence.

Actions seeking to enforce restrictive covenants are equitable in nature and enforcement will not be had where it would contravene public policy (*Silverstein v Shell Oil Co.,* 40 AD2d 34, affd 33 NY2d 950).

The dramatic disclosures involving the care and treatment of the mentally retarded at Willowbrook and similar institutions have enlightened us to the injustice inherent in institutionalizing vast numbers of mentally disabled

individuals who, while not quite capable of independent living, are able to more fully realize their individual potential if placed in a less restrictive environment. Thus, in recent years, on both the State and Federal level, great emphasis has been focused upon efforts to maximize treatment services and habilitation programs for persons with developmental disabilities, while at the same time steps have been taken to assure that such services are provided in a fashion that is least restrictive to personal liberty. In particular, these efforts have been characterized by the deinstitutionalization of the mentally retarded and their placement in less restrictive environments in the community at large.

In the Federal area this effort is embodied in the provisions of the Developmentally Disabled Assistance and Bill of Rights Act (US Code, tit 42, § 6000 *et seq.*). Here in New York, Governor Carey committed the State to a major program of deinstitutionalization in the 1975 consent decree in *New York State Assn. for Retarded Children v Carey*, 393 F Supp 715, 717). Implementation of this policy of establishing community residences for the mentally disabled has been greatly aided by the passage of the Padavan Law (Mental Hygiene Law, § 41.34), which sets forth guidelines for site selection for such facilities. At the time of its enactment, the Legislature determined "that mentally disabled individuals have the right to attain the benefits of normal residential surroundings". It further declared "that the opportunities for mentally disabled individuals will be enhanced, and the delivery of services improved, by providing these individuals with the least restrictive environment that is consistent with their needs, and that such environment will foster the development of maximum capabilities. It is the intention of this legislation to meet the needs of the mentally disabled in New York State by providing, wherever possible, that such persons remain in normal community settings, receiving such treatment, care, rehabilitation and education, as may be appropriate to each individual. It is further intended that communication and cooperation between the various state agencies, local agencies and local communities be fostered by this legislation, and that this will be best achieved by

establishment of clearly defined procedures for the selection of locations for community residences, to best protect the interests of the mentally disabled and ensure acceptance of community residences by local communities. In the establishment of such community residences, the legislature recognizes the need to avoid, wherever practicable, a disproportionate distribution of community residences and other similar facilities" (L 1978, ch 468, § 1).

These expressions of purpose were echoed by Governor Carey, who stated in approving this landmark legislation, that "the bill aims to facilitate the establishment of community residences by discouraging frivolous legal challenges that have needlessly delayed proper establishment of such facilities in the past, at great cost to the litigants" (NY Legis Ann, 1978, pp 273, 274).

We view this expressed policy as being broad enough to overcome not only challenges to group residences which are based upon local zoning ordinances, but also those based upon private restrictive covenants (see *Silverstein v Shell Oil Co.*, 40 AD2d 34, affd 33 NY2d 950, *supra*). The provisions of the Padavan Law, which establish guidelines for community participation in the site selection process, provide a sufficient check on the possibility of any one community or neighborhood becoming saturated with such residences or of a residence being placed in an entirely inappropriate locale (Mental Hygiene Law, § 41.34). Beyond that, however, communities and residents should not be permitted to decide unilaterally by means of restrictive covenants, possibly employing language more specific than that at bar, that they will not permit the establishment of group residences in their area.

Accordingly, we reverse Special Term's grant of partial summary judgment in favor of plaintiffs, declare that the use in question is not violative of the terms of the restrictive covenant and as a matter of public policy, such a private restrictive covenant as the one at bar may not be enforced so as to prevent the establishment of community residences under the Mental Hygiene Law, and dismiss the complaint insofar as it, seeks injunctive relief.

THOMPSON, J. P., RUBIN and BOYERS, JJ., concur.

Order of the Supreme Court, Suffolk County, dated May 28, 1981, reversed insofar as appealed from, on the law, with $50 costs and disbursements, summary judgment is granted to the defendants, it is declared that the establishment of the community residence in question is not violative of the restrictive covenant that encumbers the utilization of the individual defendants' residence and as a matter of public policy, such a private restrictive covenant as the one at bar may not be enforced so as to prevent the establishment of community residences under the Mental Hygiene Law, and the complaint is otherwise dismissed insofar as it seeks injunctive relief.