Charles E. GREGORY et al.

v.

STATE of Rhode Island, DEPARTMENT OF MENTAL HEALTH, RETARDATION AND HOSPITALS.

No. 85–118–Appeal.

Supreme Court of Rhode Island.

July 17, 1985.

Joanne Glod, C.R. Bengtson, Carroll Kelly & Murphy, Providence, for plaintiff.

John Breguet, Chief Legal Officer for State Dept. of MHRH, Arlene Violet, Atty. Gen., Constance Messore, Thomas Martin, Sp. Asst. Attys. Gen., Diane Curran, R.I. Legal Services as amicus curiae, Providence, for defendants.

## OPINION

KELLEHER, Justice.

This case presents for our review a narrow and unremarkable problem involving the construction of terms contained in a common restrictive covenant found in the parties' deeds. The broader issue providing the context for this case, however, is the complicated and emotional dilemma of where in our communities group homes for our mentally retarded citizens belong. The Rhode Island Department of Mental Health, Retardation and Hospitals (DMHRH), the defendant in this case, has requested our review of the ruling by a Superior Court justice enjoining the DMHRH from building a group home for six mentally retarded adults on Cooke Drive in Scituate, Rhode Island.[1] We reverse.

The plaintiffs in this action are all homeowners on or near Cooke Drive. The Gregorys'[2] property abuts the wooded lot that is owned by the DMHRH and targeted for development as a group home. The real estate owned by all the plaintiffs and by the DMHRH is subject to the following restrictive covenant:

"Said lot is also conveyed subject to the following restrictions: *That only a single one-family dwelling house*, not to exceed 2½ stories in height, and other buildings incidental thereto, shall be built or placed thereon; * * * that said premises shall be used for *private residential purposes only.*" (Emphasis added.)

In November of 1984 the Gregorys commenced suit in Superior Court seeking a preliminary injunction to prohibit construction of the group home alleging that its

---

1. Although the trial justice granted a preliminary injunction, the parties have stipulated that the ruling shall be considered as a permanent injunction for purposes of our review.

2. There are eleven plaintiffs named in the amended complaint, of whom the Gregorys are representative. In the interests of clarity, we shall refer to only the Gregorys, but our reference encompasses all eleven plaintiffs.

placement in their neighborhood would be in violation of the "single one-family dwelling" and "residential purposes only" language contained in their common restrictive covenant.

At the hearings on the preliminary injunction, the Gregorys argued that the DMHRH is bound by the terms of the restrictive covenant and that a group home is institutional and commercial in nature, falling decidedly outside the definitional scope of a "single one-family dwelling." They further expressed commonly held fears that the presence of the group home would depress property values and "destroy the integrity * * * [and] the tranquility of the neighborhood that we enjoy and paid for." Neither homeowner testifying seriously objected to the physical appearance of the proposed three-bedroom group home except to question whether it would acquire an "institutional flavor" from the existence of a concrete walkway surrounding the home and other accommodations necessary for wheelchair access. The homeowners' position was, perhaps, best summarized by a neighbor, who testified:

"[L]et me just say I have supported the concept in the sense that I believe in the necessity of providing adequate and appropriate services for the mentally retarded, and I would have to tell you I voted in favor of the bond issue on a previous occasion to provide funding for this type of thing. I do feel, however, that the State, notwithstanding its desire and intentions to carry out that type of program, has an obligation to locate these homes in such a way that they do not adversely impact upon the neighborhoods where they are located, and I do feel that mixed neighborhoods, where there is a combination of residential and business use, are perhaps more appropriate for this type of activity, given the mix or the hybrid nature of the activity in the sense that it certainly has business characteristics, and yet, at the same time, I do not dispute the fact many of the activities are the same activities that go on in my home and your home and everyone else's home, but I believe that the State really has an obligation to act in a responsible manner, and to locate these homes appropriately, and that my feeling is that there is sufficient land around where this particular home could be built, in a different type of area, without infringing upon the rights of the people that have bought and owned and have invested in this particular neighborhood."

Doctor Robert L. Carl, Jr., testified for the DMHRH in his capacity as Executive Director for Retardation for the State of Rhode Island. As the developer of the group-home concept in Rhode Island, Dr. Carl described for the court the organization and day-to-day functioning of a group home. He characterized the group home as a "family-style living arrangement" for a small group of compatible retarded persons who would "live together, work together, would grow together, [and] would grow old together." He also stated that in terms of composition, the residents of the Scituate group home would be severely retarded individuals, some of whom would need wheelchairs for mobility, and some of whom would need more help' than others with routine tasks.

Doctor Carl told the court that an average day for the resident of a group home involves rising around seven o'clock, taking care of routine personal needs like washing, shaving, dressing, fixing breakfast, and, if necessary, lunch, and then heading out for the day, five days a week, either to school or to a work situation. While the residents of the group home attend school or work, the staff of the home, one to three persons on duty on a rotating schedule, twenty-four hours a day, clean or do the grocery shopping or perform other related tasks. Upon returning from school or work, the residents share responsibility for chores around the house, cook dinner, and watch television or attend dances or movies or participate in other activities before bed. When necessary, the residents are assisted by a staff member.

The residents are individually responsible for choosing their clothing and other personal effects and plan meals with the help of a flexible, nutrition-conscious menu plan. The group home does its own grocery shopping; laundry is done in the home; and medical attention, like necessary physical therapy, is provided during work or school or at a medical office. Transportation is usually provided by the group home's vehicle.

In describing the role of the trained staff, Dr. Carl analogized it to "a parent-like kind of arrangement, making sure someone arrives someplace and hopefully advocating on behalf of the folks to make sure they are receiving appropriate developmental or educational or vocational-type of services." In summing up the functional aspects of a group home, Dr. Carl explained, "It's just like home, and that's of course, what this program is all about, being in a situation [where] we can guarantee a small, personal family-style living arrangement, and that's really what we're all about."

Doctor Carl further addressed himself to the problem of what types of communities are appropriate for group homes. He disagreed with the homeowners who offered the suggestion that group homes properly belong in neighborhoods containing a mixture of residential and commercial uses and not in purely residential communities. In explaining why a "mixed" neighborhood would be inappropriate, Dr. Carl stated:

"We're not looking for some kind of a transitional neighborhood, or neighborhood that has truck deliveries, and those kind of things. * * * These are folks who need to have the opportunity to live in a small family-style neighborhood situation, and it would be totally inappropriate, we think, to seek out those kinds of transitional neighborhoods as the optimal place to live. We are looking for nice neighborhoods, and places where we think [it] would be most conducive to growth, development, safety, to the kind

of securities that all the rest of us are looking for in our neighborhoods."

The DMHRH also presented an expert real estate appraiser who had prepared a report studying the impact of eight Rhode Island group homes on their communities. Among the factors considered were resale value of neighboring homes, length of time to resale, neighbor reactions to the presence of the group home, and the demand generated by the group home for related support services like fire and police protection. The report concluded that "there is no basis for the assumption[s] that property values decrease in neighborhoods where group homes are located * * * [and] based on the personal reactions of [the] neighbors, we find that there are no adverse feelings."

The trial justice ruled that construction of the group home on Cooke Drive would violate the restrictive covenant since a group home

"is commercial in nature not residential. The testimony of Dr. Carl relative to the required care, maintaining of records and the nature of the entities managing such Group Homes clearly places their operation, although of a non-profit character, in a category incongruous to the kind of dwelling required to conform to the restrictive covenant."

We believe the trial justice erred as a matter of law in finding that a group home is a business or commercial enterprise. There is overwhelming support for the position that a group home for six mentally retarded individuals is a "single-family dwelling" for "residential purposes."

In construing the terms of a restrictive covenant, we are mindful of the oft-repeated maxim that restrictive covenants are to be strictly construed in favor of the free alienability of land while still respecting the purposes for which the restriction was established. *Hanley v. Misischi*, 111 R.I. 233, 238, 302 A.2d 79, 82 (1973); *Emma v. Silvestri*, 101 R.I. 749, 751, 227 A.2d 480, 481 (1967). Further, we have held that cases involving the interpretation

of restrictive covenants must be decided on a case-by-case basis since they "present such a wide spectrum of differing circumstances." *Hanley v. Misischi,* 111 R.I. at 238, 302 A.2d at 82; *see also Farrell v. Meadowbrook Corp.,* 111 R.I. 747, 750, 306 A.2d 806, 808 (1973).

■ Here, the covenant itself contains no definitions of either "single-family dwelling" or "residential." The task presented to this court, then, is the narrow one of construing the meaning of these terms. As in statutory construction, these words should be given their plain and ordinary meaning unless a contrary intent is discernible from the face of the instrument. *Lancellotti v. Lancellotti,* R.I., 481 A.2d 7, 10 (1984); *Little v. Conflict of Interest Commission,* 121 R.I. 232, 397 A.2d 884 (1979).

Case law from other jurisdictions is voluminous with respect to the definitions of the terms "single-family dwelling" and "residential" found in restrictive covenants, with the overwhelming majority supporting the inclusion of group homes within their scope. Two recent cases are particularly illustrative. In *Knudtson v. Trainor,* 216 Neb. 653, 345 N.W.2d 4, (1984), the Nebraska Supreme Court was faced with a restrictive covenant that provided:

"No lot shall be used except for *residential purposes.* No building shall be erected, altered, placed or permitted to remain on any lot other than one detached *single family dwelling* not to exceed two and one-half stories in height, and a private garage." (Emphasis added.) *Id.* at 654–55, 345 N.W.2d at 5.

The court pointed out that a building used for residential purposes is one in which people make their homes as opposed to one in which a business is conducted. In reaching the conclusion that a group home for five mentally retarded women would be a residential use of the property, the court found determinative that the group home would be a permanent residence for the women, that they would share the common areas, prepare and eat meals together, and have houseparents who would teach them "the skills which are normally taught and performed in a residence such as taking care of the house, cleaning, preparing meals and money management." *Id.* at 655, 345 N.W.2d at 6.

In determining the scope of the term "single-family dwelling," the court looked to other jurisdictions and quoted the following language from the Minnesota Supreme Court:

"From the outside, the home looks like all the other single-family homes in the neighborhood. The residents live in a family-type setting and call the dwelling their home." *Costley v. Caromin House, Inc.,* 313 N.W.2d 21, 26 (Minn. 1981).

The court then concluded that in appearance and use, the proposed group home would not violate the terms of the restrictive covenant.

In *Crane Neck Association, Inc. v. NYC/Long Island Community Services Group,* 92 A.D.2d 119, 460 N.Y.S.2d 69 (1983), the restrictive covenant in issue limited construction to "single family dwellings and outbuildings" and provided that "no part of said property nor any of the buildings to be erected thereon shall be used for any business purpose whatsoever * * *." *Id.* at 121, 460 N.Y.S.2d at 71. The homeowners' association in that case sought to block the establishment in its neighborhood of a community residence for eight mentally disabled adults. The court recognized that the term "family" does not always delineate a "traditional, biological concept" and focused its inquiry on whether "in theory, size, appearance and structure the group residence emulated the traditional family unit." *Id.* at 124, 460 N.Y. S.2d at 73. The court then examined the goals of the group-home movement and determined that where the primary object was to create a relatively permanent environment "operating as a single household unit" with a set of houseparents, and which "as much as possible bears the generic characteristics of the traditional family,"

the community residence satisfied the requirements of the restrictive covenant. *Id.* at 127, 460 N.Y.S.2d at 74.

Other jurisdictions have supported these concepts: *Brady v. Superior Court,* 200 Cal.App.2d 69, 19 Cal.Rptr. 242 (1962) (emphasizing the single-housekeeping unit and joint occupancy of entire dwelling); *J.T. Hobby & Son, Inc. v. Family Homes of Wake County, Inc.,* 302 N.C. 64, 274 S.E.2d 174 (1981) (emphasizing that the group home functioned as an integrated unit performing the same activities as other homes); and *Malcolm v. Shamie,* 95 Mich.App. 132, 290 N.W.2d 101 (1980); *City of White Plains v. Ferraioli,* 34 N.Y.2d 300, 313 N.E.2d 756, 357 N.Y.S.2d 449 (1974); and *Crowley v. Knapp,* 94 Wis.2d 421, 288 N.W.2d 815 (1980) (all emphasizing the significance of the permanent nature of the living arrangements).[3]

■ We find ourselves in further agreement with other jurisdictions that have held that the incidental necessities of a group home, such as maintaining records, filing accounting reports, and managing, supervising, and providing care in exchange for payment, are collateral to the prime purpose and function of a family housekeeping unit. *Beres v. Hope Homes, Inc.,* 6 Ohio App.3d 71, 74, 453 N.E.2d 1119, 1122 (1982). In *J.T. Hobby & Son, Inc.,* 302 N.C. at 73, 274 S.E.2d at 180, the court stated:

> "That defendant [group home] is compensated for the services it renders does not render its activities at the home commercial in nature. * * * That defendant is paid for its efforts does not detract from the essential character of its program of non-institutional living for the

retarded. Clearly, the receipt of money to support the care of more or less permanent residents is incidental to the scope of defendant's efforts."

*See also Costley v. Caromin House, Inc.,* 313 N.W.2d at 26.

We are thoroughly persuaded that the group home proposed for Cooke Drive will not contravene the requirements or the spirit of the restrictive covenant the Gregorys seek to enforce. The purpose of the covenant, the preservation of the quality of life and character of the neighborhood, is in no way threatened by the presence on Cooke Drive of a home, carrying on the day-to-day activities of all the other homes, with its only significant distinguishing feature being that the members of the household are disabled to varying degrees by mental retardation.

We conclude, therefore, that the proposed group home for six mentally retarded citizens is within the definitional scope of a "single-family dwelling" for "residential purposes only" and is not commercial in nature.

Accordingly, the appeal of the DMHRH is sustained, and the order appealed from is vacated. The papers in this case are remanded to the Superior Court with directions to enter an order dismissing the plaintiffs' complaint.

---

**3.** We would also note that in Rhode Island G.L. 1956 (1980 Reenactment) § 45–24–22 defines "family" for purposes of local zoning laws:

> "Community residences.—Wherever six (6) or fewer retarded children or adults reside in any type of residence in the community, they shall be considered a family and all requirements pertaining to local zoning are waived."

In *Mongony v. Bevilacqua,* R.I., 432 A.2d 661 (1981), we determined that a group home for six

mentally retarded persons satisfied a Johnston zoning ordinance defining "family" as "[o]ne or more persons living as a single non-profit housekeeping unit, as distinguished from a group occupying a hotel or club." Johnston Town Code, Zoning art. XVIII (19) (1980). While neither authority is controlling, both lend illumination and support to our discussion here.